# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

EDDIE M. DIAZ,

                     Plaintiff,

      -against-

PARAGON MOTORS OF WOODSIDE,
INC. and AMERICREDIT FINANCIAL
SERVICES, INC.,

                 Defendants.

-----------------------------------------------------------X

Case No. CV-03-6466 (CPS)(SAC)

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT

**Sadis & Goldberg LLC**
**Attorneys for Plaintiff**
**463 Seventh Avenue, Suite 1601**
**New York, New York 10011**
**(212) 947-3793**

## I.   **PRELIMINARY STATEMENT**

Eddie Diaz brought this action against Paragon Motors, a car dealer, after his purchase of a used car went sour. Diaz, like many consumers, was the victim of misleading and deceptive sales practices– many of which violated federal and state disclosure laws.

Specifically, Paragon violated the Truth in Lending Act by unilaterally raising the purchase price of the vehicle and burying a "bank fee" into this inflated purchase price. A bank fee, like the one imposed on Diaz, is a "finance charge" under the Truth in Lending Act and one which must be disclosed in the financing agreement as part of the finance charge. A creditor may *not* bury this charge in the purchase price. Paragon's failure to disclose the bank fee as a finance charge results in an artificially low annual percentage rate and is a *per se* violation of the Truth in Lending Act's disclosure requirements. Paragon included at least two other "hidden finance charges" into the purchase price of the car. These other charges are discussed below.

Paragon likewise violated the Equal Credit Opportunity Act by taking an adverse action with respect to Diaz's credit application and by failing to provide Diaz with the written notification required by the statute that such adverse action was taken. The ECOA requires written notification to a consumer whenever an adverse action is taken on a credit application. Paragon failed to notify Diaz of the adverse actions taken against his credit application and conceded at deposition that it never provides the requisite notices.

Finally, Paragon violated New York's disclosure requirements for used vehicles that were previously used as rental vehicles. Vehicle & Traffic Law § 417-a mandates that used car dealers disclose a vehicle's history in writing to a consumer before the purchase if that history includes use

1

as a rental car. The New York legislature determined that rental cars suffer from a diminished market value and that such history should be disclosed to a prospective buyer when negotiating a purchase. In this case, Paragon disclosed the vehicle's rental history *after* Diaz had already given $6,000 to Paragon to buy the vehicle and *after* Diaz had signed all of the other purchase documents. And, equally important, Paragon failed to use the disclosure form required by the statute, or include the disclosure in the contract of sale as required. Accordingly, Diaz is entitled to judgment on this claim as well.

Diaz is, therefore, entitled to judgment as a matter of law on the following claims:

      (i)      Count I under the Truth in Lending Act, 15 U.S.C. § 1638, *et seq.*;

      (ii)     Count II under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*; and

      (iii)    Count VII under New York Vehicle & Traffic Law § 417-a.

Upon granting judgment as to liability on these claims, Diaz will present his proof on damages at the trial of the remaining claims.

## II.    <u>DIAZ IS ENTITLED TO SUMMARY JUDGMENT</u>

Rule 56 of the Federal Rules of Civil Procedure directs that judgment be awarded where the pleadings, admissions, and depositions demonstrate that "there is no genuine issue of material fact" to be litigated. FRCP 56(c). Parties opposing a summary judgment motion must show sufficient evidence to raise a *genuine* issue as to a *material* fact. <u>Anderson v. Liberty Looby, Inc.,</u> 477 U.S. 242, 252, 106 S.Ct. 2509 (1986). "The mere existence of a scintilla of evidence... will be insufficient; there must evidence on which the jury could reasonably find for the [party opposing

2

the motion]". Id. As such, the factual disputes cannot be feigned, they must be actual disputes supported by evidence in admissible form.

Diaz is entitled judgment as there are no factual disputes that need to be resolved at trial. Diaz's motion is supported by documents prepared by defendant Paragon, and testimony from Paragon's general manager, which prove that the various disclosure statutes have been violated. Paragon cannot now oppose the motion by submitting testimony by means of an affidavit which contradicts its deposition testimony. Margo v. Weiss, 213 F.3d 55 (2d Cir. 2000); Mack v. United States, 814 F.2d 120 (2d Cir. 1987)("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment").


### III.   PARAGON VIOLATED THE TRUTH IN LENDING ACT IN A MULTITUDE OF WAYS

"Passage of the Truth in Lending Act in 1968 culminated from several years of congressional study and debate as to the proprietary and usefulness of imposing mandatory disclosure requirements on those who extend credit to consumers in the American market." Mourning v. Family Publications Service, Inc., 411 U.S. 356, 363, 93 S.Ct. 1652, 1657 (1973). The purpose of the Act is to "assure meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices". 15 U.S.C. § 1601(a).

In order to effectuate this purpose, TILA requires that the credit agreement clearly and conspicuously disclose the total finance charge that will be imposed. 15 U.S.C. § 1638(a)(3). The

3

finance charge– or, the cost of the credit– must be disclosed in order "to prevent creditors from circumventing TILA's objectives by burying the cost of credit in the price of the goods sold". Walker v. Wallace Auto Sales, Inc., 155 F.3d 927 (7th Cir. 1998), citing Mourning, supra. A finance charge that is buried within the cash price of the goods sold is often referred to as a hidden finance charge. In the instant matter, Paragon included three separate hidden finance charges into the cash price of the car that Diaz purchased.

A.     **The Bank Fee Incurred by Paragon, and Then Passed onto Diaz, Is a Finance Charge That Must Be Disclosed as Such**

Section 1605(a) provides the definition of a finance charge for purposes of TILA. The finance charge is the "sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit". 15 U.S.C. § 1605(a). Thus, any charge that the consumer incurs and which derives from the extension of credit is a finance charge.

The statute itself, and the regulations implemented to effectuate the statute, both include "loan fees" or "acquisition fees" as a finance charge that must be disclosed as such. 15 U.S.C. § 1605(a)(3) and 12 C.F.R. § 226.4(b)(6). The regulation expounds on these charges and defines them as "[c]harges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation". 12 C.F.R. § 226.4(b)(6). Accordingly, when a creditor sells a credit agreement to a third party, and that third party charges a fee for taking assignment of the credit agreement, that fee is a finance charge if it is passed onto the borrower.

This arrangement, where a creditor sells a consumer credit agreement to another creditor, is

4

prevalent in the automobile industry and the burying of finance charges into the price of the goods

has been the subject of many actions under TILA. See e.g., Cornist v. B.J.T. Auto Sales, Inc., 272

F.3d 322 (6th Cir. 2001); Walker v. Wallace Auto Sales, Inc., 155 F.3d 927 (7th Cir. 1997); Knapp

v. Americredit Financial Services, Inc., 245 F.Supp.2d 841 (S.D.W.Va. 2003); Kilbourn v. Candy

Ford-Mercury, Inc., 209 F.R.D. 121 (W.D.Mich. 2002).

A review of those cases, as well as the deposition testimony of Joseph Rivera in this matter,

show the basic picture of "indirect financing" in the used-car trade. In short, it is the dealer's job to

both sell the car and to arrange financing for the customer. Joe Rivera testified that most dealers,

including Paragon, have access to a closed website called "Dealer Track". Rivera Dep., p. 14. The

dealer will post information about a particular consumer or transaction on the Dealer Track system

and, in essence, allow the banks to bid on the transaction. Rivera Dep., pp. 19-21. Often, Paragon

will have to "rehash" the deal in order to get a bank to approve the potential loan agreement.

Benstock Dep., pp. 150-151.

Part of rehashing a deal will include negotiating with the third party bank an acquisition fee,

or a discount. Knapp v. Americredit Financial, supra at 844. An acquisition fee is a fee charged by

Americredit to the dealer for accepting assignment of the loan agreement. Rivera Dep., p. 69-70.

This fee can range from $100 up to $595 and is dependent upon the consumer's credit worthiness.

Id.; see also Knapp, supra at 844. A discount is no different than an acquisition fee except that the

third party bank will deduct the acquisition fee from the "purchase price" of the loan and, thus, buy

the loan at a discount. Walker v. Wallace Auto Sales, supra at 929.

No matter the form it takes, any charge that is part of the extension of credit is a finance

charge if it is passed onto the consumer. Knapp, supra at 846 ("Clearly, the acquisition fee is a TILA

5

finance charge, if the consumer is required to pay it"); Walker, at 934 ("nothing in the law prevents a merchant-creditor from passing on the full cost of the discount imposed by an assignee to a credit purchaser. However, if the merchant-creditor chooses this route, TILA requires that it disclose that amount to the purchaser as a finance charge").

Like the plaintiffs in the above-cited cases, Diaz alleges here that the acquisition fee charged by Americredit was passed on to him and, rather than being disclosed as part of the finance charge, it was buried into the cash price of the vehicle. In order "to establish a TILA cause of action for an undisclosed finance charge, the plaintiff must demonstrate a 'causal connection' between the higher price and the extension of credit". Cornist, supra at 327. A consumer can show this causal connection through the use of either direct evidence or circumstantial evidence. Id.; see also Kilbourn, supra.

The Western District of Michigan, in Kilbourn v. Candy Ford-Mercury, found that the plaintiff's direct evidence of statements made by the salespeople tying the price increase to her financing needs established a *prima facie* case for a hidden finance charge. The Kilbourn plaintiff testified that the salesmen "said that she was paying more than the advertised price for her vehicle because she has special financing needs". Kilbourn, supra at 130.[1] And the Sixth Circuit in Cornist acknowledged that either circumstantial evidence can be used to prove the price increase was due to the cost of credit or "direct evidence [like] statements that the price was increased because the purchase was made on credit" can be used. Cornist, supra at 327.

---

[1] The facts presented in Kilbourn are strikingly similar to Diaz's claim for a second violation of TILA– that the price of the car was increased above the advertised price due to special financing needs. Special financing is a another term used for subprime financing, which is discussed later. Benstock Dep., p. 82.

In this case, Diaz has both documentary proof and testimony from Paragon's general manager that the price of the car was increased to cover the acquisition fee that Americredit charged on this transaction.

Diaz's purchase was first approved by a bank called "CPS" on May 9, 2003, the day on which Diaz first went to Paragon and signed the buyer's order. Exhibit 2. In response to Paragon's "payment call", CPS "prechecked" Diaz for a monthly payment not to exceed $350, with an acquisition fee of $199.00. Id.[2] The precheck is not an approval *per se* as it is still conditioned on the deal structure being approved by CPS. Id.

Nevertheless, Paragon must have felt confident that it could structure a deal within the $350 payment approved by CPS as it then prepared all of the closing documents. Paragon generated a retail installment contract with a monthly payment of $350 per month for 60 months, a bill of sale, a dealer's "worksheet", and a "posting sheet". See Exhibits 10, 11, 12 and 13. All of these documents are dated May 10, 2003.

For some reason, CPS must have ultimately rejected the deal. Paragon has provided no documents from CPS other than the "precheck" approval and Benstock was unable to state why the deal was never funded with CPS. Benstock Dep., p. 96. As Benstock stated, "for some reason, the deal was given to Americredit". Benstock Dep., p. 97.

All that is known is that two days later, May 12, 2003, Paragon resurrected the deal by resubmitting the deal to Dealer Track. Americredit approved the deal on May 12, 2003 while

---

[2] A payment call is a type of abridged credit application. In a payment call, the dealer is trying to determine the highest monthly payment that a consumer will qualify for. With this information, the dealer can then determine the car (or at what price) it can finance a deal. Rivera Dep., p. 37; see also Exhibit 4 (Diaz's credit application indicating "payment call" on the bottom).

another bank, Drive Financial, requested more information. Exhibits 7 and 8 (both dated May 12, 2003).

The approval given by Americredit was on less advantageous terms than the initial approval given by CPS. For example, Americredit insisted on a $495 acquisition fee while the fee required by CPS was only $199. Exhibits 7 and 5. Americredit also approved a monthly payment of up to $367, compared to CPS's $350 monthly cap.

The internal documents prepared by Paragon in anticipation of the CPS deal clearly show that the price of the car was increased in order to cover the higher acquisition fee on the Americredit deal. For example, the dealer worksheet for the CPS deal shows the purchase price of the car at $16,130.13. Exhibit 12. The dealer worksheet prepared for the Americredit deal, with its higher acquisition fee, shows the purchase price of the car at $16,590.

At deposition, Paragon's general manager was asked to explain the price increase between the two transactions. "If there's a plausible reason for the difference, the acquisition fee would be the reason for the difference". Benstock Dep., p. 152. Benstock then reiterated this by reminding us that "on the previous one it was one hundred something dollars". Id.

Accordingly, Paragon's own internal documents show that the purchase price of the vehicle increased by approximately $400 between May 10th and May 12th. The only intervening circumstances that could explain the reason for the price difference is the higher acquisition fee charged by Americredit. And this was exactly what Benstock testified to.

As noted above, a TILA plaintiff must establish a "causal connection" between the increased price and the extension of credit in order to prevail on a hidden finance charge claim. Clearly, a $400 price increase after a $300 increase in the acquisition fee to be charged to the dealer– coupled

8

with the dealer's admission– goes beyond a causal connection. Cornist, at 327. Benstock might have put it best when he said "[i]f there's [any] plausible reason for the difference, the acquisition fee would be the reason...".

Since the evidence clearly shows that the price of the goods increased because of the higher acquisition fee, the acquisition fee must be considered a finance charge. The additional fee was not, however, disclosed as part of the finance charge but was instead buried into the price of the goods. As such, Paragon violated TILA and Diaz is entitled to judgment.

**B.      The Increase in Price Above the Advertised Price Is a Hidden Finance Charge Since Diaz Was Forced to Pay the Increase Due to His Special Financing Needs**

In addition to the bank fee, Paragon buried other hidden finance charges into the cash price of Diaz's vehicle. The second hidden finance charge is the price increase between the advertised price of $13,495 and the ultimate purchase price of $16,590. Since this increase in price was the result of Diaz's poor credit and his need to finance through a subprime lender, it is an incident to the extension of credit and should have been disclosed as part of the finance charge.[3]

Diaz testified at deposition that he agreed to purchase the vehicle at the advertised price with the salesperson, "Majid." Diaz Dep., pp. 25-26. When Diaz returned to complete the transaction on May 13th,[4] he was told that he did not qualify for the advertised price because he was not approved

---

[3] Borrowers with poor credit are subject to higher interest rates to compensate the lender for the increased risk associated with such borrowers. But consumers with poor credit cannot be charged higher prices for the goods they are buying.

[4] Diaz testified that although the documents are all dated May 12, 2003, none of them were executed until the following day, May 13th. Diaz Dep., pp. 31-33. Diaz does not assign any significance to this.

by a primary lender. Diaz Dep., p. 37. This is also consistent with the advertisement which states that the advertised "Price/Payments [are] based on approval by primary lender". Exhibit 1.

Again, if the price of the car increased because Diaz was financing his purchase, this increase is a finance charge. This was precisely the issue presented to the Western District of Michigan in Kilbourn, supra. The Kilbourn plaintiff testified that she went to the dealer based on an advertised price and asked if she could buy the car at that price. The plaintiff testified that two salespersons explained to her that she would have to pay a higher sales price "because she had special financing needs". Kilbourn, at 130. "If Kilbourn was told that she was paying more for her vehicle because she was a credit customer, this would support her claim for a TILA violation under the standard set out by the Sixth Circuit [in Cornist]". Id. The court, however, did not grant the plaintiff summary judgment as the salespersons who purportedly made the admissions submitted affidavits in opposition claiming that that conversation never occurred. Thus, the court found that an issue of fact existed as to whether the plaintiff actually paid more because of her special financing needs.

The instant case presents an identical situation except that Paragon will not be able to rebut Diaz's testimony that the finance manager specifically advised him that the price was increased because he required subprime financing.[5] Moreover, any such testimony would contradict the

---

[5] Prime lenders allow car dealers to mark up the interest rate at which consumers are charged. The additional money this mark-up provides is then split between the dealer and the bank in what is termed a "finance reserve". Subprime lenders often do not allow the dealers to increase the interest rate and, as such, dealers may make more money by financing through a prime lender than a subprime lender. Although not necessary for this motion, this is the most likely explanation of why Paragon conditioned the advertised price on approval by a prime lender. See e.g., Benstock Dep., p. 118 (testifying that on the Americredit deal there was no finance reserve and thus Paragon would not make any money selling the finance contract, while then testifying that if it were a deal with a primary lender "It's customary on most deals for there to be a finance reserve").

advertisement which states that the prices listed are conditioned upon approval by a primary lender. See Hook v. Baker d/b/a Del's Auto Sales, 352 F.Supp.2d 839 (S.D.Ohio 2004)(granting summary judgment to the plaintiff on a TILA hidden finance charge claim based on the defendant's deposition testimony); Compton v. Altavista Motors, Inc., 121 F.Supp.2d 932 (W.D. Va. 2000)(also granting summary judgment on TILA hidden finance charge claim based on defendant's deposition testimony that a "processing fee" was only charged to consumers buying on credit).

Benstock testified unequivocally that the $13,495 advertised price was readily available to customer's willing to pay cash. Benstock Dep., pp. 51, 64. Thus, there can be no dispute that the price increased and, based on the unrefuted testimony which is buttressed by Paragon's own advertisement, that price increase was due to the fact that Diaz was financing through a subprime lender. Accordingly, this price increase was an incident to the extension of credit and would not be charged to cash-paying buyers. Diaz is, therefore, entitled to judgment for a second violation of TILA.

### C.    Since Paragon Required Diaz to Purchase An Extended Warranty as a Condition to Financing, The Cost of that Warranty Was Also a Finance Charge That Must Have Been Disclosed as Such

As noted above, TILA defines a finance charge to include any charge that is imposed as an incident to the extension of credit. 15 U.S.C. § 1605(a). Thus, several circuit courts have concluded that when creditors require borrowers to purchase a service agreement, or extended warranty, with the goods that are being financed, the cost of the service agreement is an incident to the extension of credit and must therefore be disclosed as a finance charge. See e.g., Carney v Worthmore Furniture, Inc., 561 F.2d 1100 (4th Cir. 1977); Berryhill v. Rich Plan of Pensacola, 578 F.2d 1092

(5th Cir. 1978).

In <u>Carney,</u> for example, the creditor required buyers who chose to finance their purchases to also buy a service agreement which provided repairs to the financed goods. The price of the service agreement was then included into the purchase price of the goods. The <u>Carney</u> court found that since the service agreements were required in order to obtain financing, it was an incident to the extension of credit and, therefore, a finance charge. The court upheld the judgment entered in the district court under TILA.

The Fifth Circuit reached the same conclusion in <u>Berryhill, supra</u>. The creditor in <u>Berryhill</u> required buyers who financed their purchases to also agree to enter into a service agreement. The court found that "since Rich Plan would not sell to the Berryhills on credit until they purchased a Service Agreement", the cost of the service agreement was a finance charge that had to be disclosed as such. <u>Berryhill</u>, 578 F.2d at 1098.

In the instant matter, Diaz was told by the finance manager, EJ Regis, that "I would not be going to be able to get financing unless I get warranty, extended warranty on the vehicle". Diaz Dep., p. 35. In fact, when Paragon's counsel first asked Diaz whether he purchased an extended warranty, his immediate response was "I was forced to". <u>Id</u>. at 34.

Accordingly, as Diaz was required to purchase an extended warranty (at a cost of $1,800) in order to obtain financing, it is an incident to the extension of credit. The cost of this warranty was included in the purchase price of the vehicle, rather than in the finance charge, and, thus, also violates TILA's disclosure requirements.

12

IV.   **PARAGON'S FAILURE TO PROVIDE AN ADVERSE ACTION LETTER VIOLATES THE EQUAL CREDIT OPPORTUNITY ACT**

The Equal Credit Opportunity Act was enacted to prohibit discrimination in the extension of credit. Fischl v. General Motors Acceptance Corp., 708 F.2d 143, 146 (5th Cir. 1983). One of the requirements under the statute that serves its overriding purpose is the requirement that creditors who take adverse actions on credit applications provide notice that such an adverse action was taken. The notification requirement serves two purposes: (i) it will discourage discrimination since creditors will be compelled to identify legitimate reasons for adverse credit decisions, and (ii) "it educates consumers as to the deficiencies in their credit status", which will help them in attempting to improve their creditworthiness. Treadway v. Gateway Chevrolet Oldsmobile Inc., 362 F.3d 971 (7th Cir. 2004).

There is no dispute that Paragon did not provide written notification to Diaz that an adverse action was taken with respect to his credit application. Benstock Dep. Transcript, p. 142 ("Absolutely not. There is nothing in writing from Paragon telling Mr. Diaz that his credit was turned down from Condor [Bank] or any other bank"). Thus, the only issues presented to this Court are whether Paragon is a "creditor" for purposes of the ECOA and whether any "adverse actions", as defined by the Act, were taken. The answer to both is unequivocally "yes."

A.    **Paragon Is a "Creditor" As Defined by the ECOA**

The ECOA defines the term "creditor" for purposes of the statute to include "any person who regularly arranges for the extension, renewal, or continuation of credit". 15 U.S.C. § 1691a(e). In addition, the ECOA delegated rule-making authority to the Federal Reserve Board in order to

13

implement rules to further the purposes of the statute.  15 U.S.C. § 1691b(a).  The regulations enacted by the FRB are collectively referred to as Regulation B, and codified at 12 C.F.R. § 202.1 *et seq.*

Regulation B's definition of a "creditor" includes any person who "in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit."  12 C.F.R. § 202.2(*l*).

District courts throughout the country have consistently held that car dealers who arrange financing for their customers are creditors for purposes of the ECOA.  Treadway v. Gateway Chevrolet, supra; Bayard v. Behlman Automotive Services, Inc., 292 F.Supp.2d 1181 (E.D.Mo. 2003); Canon v. Metro Ford, Inc., 242 F.Supp.2d 1322 (S.D.Florida 2002); Lacey v. William Chrysler Plymouth Inc., 2004 WL 415972 (N.D.Ill. 2004); Payne v. Diepholz Ford Lincoln Mercury, Inc., 2004 WL 40631 (N.D.Ill. 2004).

As stated by the Bayard court, the regulations "suggest a continuum of participation in a credit decision from no participation, to referring applicants to the decision maker, to final decision making.  At some point along the continuum, a party becomes a creditor for purposes of the notification requirements under the Act.  Here... [the dealer's] activities in relation to the credit decision in this case placed [the dealer] at a point on the continuum where 'it participated in the decision of whether or not to extend credit' to Bayard".  292 F.Supp.2d at 1186.

The Seventh Circuit adopted the "continuum" analysis set forth in Bayard and likewise found that a car dealer's participation, including setting the interest rates and "rehashing" deal structures, was sufficient to render the dealer a creditor under the ECOA.  Treadway, supra at 980.  Specifically, the Treadway court identified the activities that the dealer engaged in when assisting its customers

14

with financing. These activities included determining the final interest rate at which the customer

will be charged, determining which lenders to submit credit applications to, structuring deals so as

to ensure that the bank's guidelines are met, and others. <u>Treadway</u>, <u>supra</u> at 979-980.

Paragon performs the same activities identified in <u>Treadway</u>, <u>Bayard</u> and the other cited

decisions. Benstock's deposition testimony provides numerous examples and a description of the

activities performed:

> (i)     Paragon sets the interest rates at which the financing will be provided.
> Benstock Dep., pp. 89 and 118-119;[6]
>
> (ii)    Paragon determines whether sending a credit application to a prime or
> subprime lender (or any lender for that matter) is worthwhile. Benstock Dep.,
> pp. 146-147;
>
> (iii)   Paragon participates in the credit decision by "rehashing" the structure of a
> deal in order to satisfy a bank's concerns. Benstock Dep., pp. 150-151;
>
> (iv)    Paragon contacts the lender in order to get approval on "difficult deals".
> Benstock Dep., p. 105; and
>
> (v)     Paragon actually agrees to extend credit. Exhibit 3 (identifying Paragon as
> the "creditor/seller").

---

[6] Benstock testified that the "finance reserve" is the difference between the interest rate at which a bank will approve a transaction (the "buy rate") and the rate at which the dealer will sell the loan to the consumer. He further testified that "[i]t's customary on most deals for there to be a finance reserve" although "[s]ometimes the bank can say maximize the payment that the customer would be approved for, in which case there may not be the ability for the dealership to mark up the finance reserve". Benstock Dep., pp. 118-119; <u>see also</u>, <u>Treadway</u>, <u>supra</u> at 980, (further discussing finance reserves and car dealers' ability to set the interest rates that consumers pay); <u>and</u> <u>Payne</u>, <u>supra</u> at *1.

Accordingly, Paragon's level of participation in arranging financing for its customers is so significant that it must be considered a "creditor" under the ECOA and its implementing regulations. Paragon's credit activities are identical to those identified in <u>Treadway</u> and dozens of district court decisions which uniformly hold that under such facts, the dealer is a creditor under the ECOA.

**B.    An "Adverse Action" Was Taken In Connection With Diaz's Credit Application**

Section 1691(d) of the ECOA requires that creditors who take any "adverse action" upon a consumer's credit application must provide a written statement of the reasons why such action was taken.  15 U.S.C. § 1691(d)(2).  Since it is undisputed that Paragon did not provide Diaz with the so-called adverse action letter, this Court must only determine whether Paragon took an adverse action and, thus, was required to send such a letter under the circumstances presented.

The ECOA defines an adverse action as a "denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested".  15 U.S.C. § 1691(d)(6).  It is the third clause of this definition that is applicable to Diaz's credit application.

Diaz's undisputed testimony is that he saw an advertisement in the Daily News for the vehicle that he eventually purchased.  Diaz Dep., p. 11.  The advertisement listed the price of the car as $13,495.  Exhibit 1.  According to the advertisement, the price listed for the vehicle was "based on approval by a primary lender".  <u>Id</u>.  While there may not have been any explicit agreement that Paragon would submit Diaz's application to prime lenders, there is no dispute that Diaz responded to the advertisement which conditioned the sales price on primary lender approval.  Diaz Dep., pp.

16

11, 25-26; see also Benstock Dep., p. 19 ("We submit all of the applications to our primary lenders

first"). Diaz and his salesman had further discussions relating to the financing and, at some point,

the salesman advised that Diaz would have to put down more money in order for the financing to

go through. Diaz Dep., p. 27.

As it turns out, Paragon never even sought "primary lender" approval for Diaz since Paragon

determined that he would not qualify. Benstock Dep., p. 146. Paragon's decision that Diaz would

not qualify for a loan with a prime lender is an adverse action under ECOA.

Indeed, this was exactly the fact-pattern presented to the Seventh Circuit in Treadway, supra.

The Treadway plaintiff, like Diaz, was considered a high-risk borrower due to a bankruptcy in her

past. Consequently, the dealership did not submit the plaintiff's credit application to any lender

since it considered such an effort futile. Instead, the dealer insisted that the plaintiff find a "co-

signer" who had stronger credit. The Treadway court reversed the district court's grant of summary

judgment in favor of the dealer. The court held that the dealer's refusal to submit the credit

application was an adverse action under the ECOA since "here, Gateway effectively became the

denier of credit". Treadway, at 975.

Similarly, the Bayard court determined that a consumer who was denied credit at the lowest

available rate, 3.9%, but who was approved at 10.9% was entitled to notice that an adverse action

had been taken on her credit application. The Bayard court relied upon the definition found in the

ECOA which includes a "refusal to grant credit in substantially the amount or on substantially the

terms requested". 15 U.S.C. § 1691(d)(6). The court reached this concluded based on the testimony

of the plaintiff and the "understanding of all parties concerned that Bayard was applying for credit

at the 3.9% APR". Bayard, 292 F.Supp.2d at 1184. The court reached this conclusion despite the

17

fact that "the credit application is silent as to the rate" applied for. Id. at 1187.

In the instant matter, Paragon took an adverse action with respect to Diaz's credit application when it unilaterally decided not to even forward his credit application to a primary lender. And Paragon's decision that Diaz would not qualify for credit with a primary lender resulted in two distinct adverse consequences– first, Diaz now did not qualify for the $13,495 "sale price" for the vehicle and, secondly, Diaz was charged a higher interest rate on his financing.

Accordingly, Paragon took an adverse action with respect to Diaz's credit application and conceded that it did not provide any written notification of such adverse action as required under the ECOA. As such, Diaz is entitled to judgment on his ECOA claim and this Court should set the matter down for an inquest on damages.

## IV.    PARAGON'S "DISCLOSURE" OF THE VEHICLE'S RENTAL HISTORY *AFTER* DIAZ PURCHASED THE VEHICLE IS INSUFFICIENT AS A MATTER OF LAW

New York Vehicle & Traffic Law § 417-a requires used car dealer's to disclose to a prospective buyer the vehicle's prior use if such prior use included use as a rental car. This section, entitled "Mandatory disclosures by sellers prior to resale", provides that:

> Upon the sale or transfer of title by a dealer of any second-hand passenger motor vehicle, the dealer shall execute and deliver to the buyer an instrument in writing in a form prescribed by the commissioner [of the Department of Motor Vehicles] which shall set forth the nature of the principal prior use of such vehicle when the dealer knows or has reason to know that such use was a taxicab, rental vehicle, police vehicle, or vehicle which has been repurchased [under the Lemon Law]...

V&T § 417-a(1)(a).

18

Accordingly, if the selling dealer knows or has reason to know that a vehicle's prior use was as a rental vehicle, the dealer must disclose such information in a "form prescribed by the commissioner" of the Department of Motor Vehicles ("DMV").

The Commissioner of the DMV has implemented regulations with respect to this disclosure requirement. In fact, as codified at 15 NYCRR 78.13(g)(1), the Commissioner has provided the *exact statement* that must be delivered to the consumer.

> The statement shall read as follows: 'Prior Use Certification (as required by Vehicle and Traffic Law, section 417-a if the principal prior use of the vehicle were as a police vehicle, taxicab, rental vehicle, or driver education vehicle). The principal prior use of this vehicle was as: a police vehicle _____, a taxicab _____, a rental vehicle _____, or a driver education vehicle _____.'
>
> This statement shall be conspicuously printed, typed or stamped on the dealer's contract of sale, and the appropriate line checked, and given to the purchaser before the purchaser signs it.

In addition, the Commissioner's regulations indicate that the disclosure must be made in the dealer's "contract of sale".

In the instant matter, Paragon attempted to circumvent the disclosure requirements by insisting that Diaz acknowledge the vehicle's rental history *after* the sale was completed. Indeed, Diaz had already paid $6,000 as a downpayment and had already signed the installment contract obligating him to make more than $21,000 in additional payments. Diaz Dep., p. 31.

But, what is at issue in this motion is Paragon's failure to comply with the disclosure requirements– namely that the disclosure be in the form mandated by the regulations and be made in the contract of sale.

A.    **Paragon's Buyer's Order Had the Required Disclosure Language But It
      Chose Not To Make the Disclosure in the Agreement**

The Commissioner's regulation is clear on its face in that it requires the disclosure to use the exact words set forth in the regulations. It even puts the required disclosure in quotations. 15 NYCRR 78.13(g)(1). Paragon will inevitably argue that its disclosure was clear and that Diaz understood its meaning when he signed it. But, as discussed below, Paragon's actions were done with the intention of duping Diaz into signing the acknowledgment. This is not a "form over substance" issue– the incorrect form allowed Paragon to circumvent the law.

The form required by the DMV has spaces, or boxes, next to each of the prior uses that must be disclosed. Thus, if a dealer is selling a rental car, it must "check the box" next to the language that indicates the car was previously a rental car. It is the checkmark in the appropriate space that is required under the statute.

In the instant matter, Paragon had Diaz sign a buyer's order on May 9, 2003.[7] Exhibit 2. The agreement is signed by Diaz and a Paragon representative, and has a number of disclosures and certifications that are required by both state and federal law. For example, federal law requires that used car sellers place a "window sticker" on all cars for sale informing the consumers of various issues, including what warranties come with the vehicle. See generally, 16 C.F.R. § 455.2. And these regulations also require dealers to "include the following language conspicuously in each consumer contract of sale. ...The information you see on the window form overrides any contrary provisions in the contract of sale". 16 C.F.R. § 455.3(b). Thus, like the New York DMV, federal regulations require certain disclosures in sales contracts for used cars.

---

[7] For the purposes of this argument, Diaz will identify the documents by the terms given to them by Paragon during Benstock's deposition.

20

Paragon complied with this requirement and conspicuously printed, verbatim, the language required by the regulations in the May 9 buyer's order. Exhibit 2.

Thus, the buyer's order includes several disclosures and certifications as required by various provisions of state and federal law. More importantly, it has the proper language for disclosing a vehicle's prior rental history.

In the lower left-hand corner of the contract, there is shaded box which includes, verbatim, the requisite disclosure under V&T Law § 417-a. *None of the boxes are checked– there was no attempt to disclose the vehicle's rental history.*

Instead, Paragon inserted language in the bill of sale, dated three days later, indicating that the vehicle was, indeed, formerly used as a rental car. Exhibit 9. The attempted disclosure does not, however, comply with the regulations as it is not in the form required by the regulation, nor is it in the contract of sale. As such, Paragon failed to make the appropriate disclosure and has violated V&T Law § 417-a.

The New York Supreme Court, Suffolk County, addressed this issue in its decision in <u>Cullen v. Northport Ford, Inc.</u>, Index No. 12731-2001 (Hon. Robert W. Doyle). The facts underlying <u>Cullen</u> are identical to those in the instant matter– the dealer attempted to make a disclosure of the vehicle's rental history but the language used did not comply with the language mandated in the regulations. In <u>Cullen,</u> the dealer inserted the following language into the purchase contract and argued that such language notified the buyer of the vehicle's rental history:

> If this box is checked, the vehicle's principal previous use included rental or lease service or police.

The <u>Cullen</u> court, acknowledging that the box was checked, rejected the dealer's argument

21

and held that the "notice provided by the dealer in the instant case does not comply with the requirements of V&T § 417-a or 15 NYCRR 78.13(g). ...Consequently, plaintiff's motion for partial summary judgment... is granted on the issue of liability". Cullen, p. 4.

Paragon, like the dealer in Cullen, chose not to use the mandated language and instead made up its own. But Paragon's attempt at disclosure is fairly transparent. Paragon could have simply checked the box on its own contract (the buyer's order) which would have indisputably complied with the statutory language. Instead, it waited until Diaz had already handed over $6,000 and signed all of the other documents completing the transaction. This is not the type of disclosure contemplated by the statute and regulations.

Accordingly, Diaz is entitled to judgment on his claim under V&T Law § 417-a since Paragon failed to disclose the vehicle's rental history in accordance with the statutory and regulatory provisions. Diaz is also entitled to judgment on this claim since Paragon's disclosure was not in the "contract of sale", or provided to Diaz before he purchased the car. A disclosure made after the car is purchased is of little use to the consumer.


**B.**    **Paragon's Attempted Disclosure Was Not In the Contract of Sale as Required**

Diaz's purchase of the car was spread out over several days and is memorialized in at least three documents which can arguably be considered the "contract of sale". One of the three documents has the required disclosure language but the box is not checked indicating prior rental use. Exhibit 2. One has no disclosure at all, and the third has an attempt to disclose the rental history but fails to comply with the regulations enacted. This Court must determine which of the three is the "contract of sale" since the regulations require that the disclosure be made in the contract

22

of sale. 15 NYCRR 78.13(g)(1).

On May 9th, 2003, Diaz responded to an advertisement in the Daily News listing the price of the car at $13,495. Diaz Dep., p. 11; Exhibit 1. Diaz agreed to buy the car, gave a $500 deposit and signed a "buyer's order". Exhibit 2. The buyer's order is silent as to the price of the car but Diaz testified that the conversation with the salesperson was that Diaz would buy the car at the advertised price. Diaz Dep., pp. 25-26.

The buyer's order states "I order and agree to purchase from you, on the terms contained on both sides of this agreement, the following vehicle:..", and identifies the vehicle. Exhibit 2. The buyer's order contains a myriad of required disclosures (discussed above) and is replete with "fine print" on the reverse side. It states that it is "not binding unless signed by the seller and the buyer". The buyer's order is, in fact, signed by both Diaz and Paragon.

Paragon relies upon one provision of the buyer's order in support of its position that this is not the contract of sale, but merely an agreement to hold the car for Diaz. Benstock Dep., pp. 29-32. In particular, Paragon submits that one of the requisite TILA disclosures makes the buyer's order non-binding. The provision states as follows:

> If you agree to assist me in obtaining financing for any part of the purchase price, this order shall not be binding upon you or me until all of the credit terms are presented to me in accordance with Regulation "Z" (Truth-in-Lending) and are accepted by me. If I do not accept the credit terms when presented I may cancel this order and my deposit will be refunded.

But by accepting the credit terms when presented, the buyer's order is binding. Thus, once Diaz agreed to the credit terms, memorialized in the installment contract, the buyer's order was a binding contract for the sale of the vehicle. The only other reading of this provision would result in

23

the terms of the installment contract superseding the buyer's order and, thereby, making the installment contract the contract of sale.

Like the buyer's order, the installment contract has all of the necessary formalities required of a contract of sale. It identifies the buyer as Diaz, the "creditor-seller" as Paragon. Exhibit 3. The opening sentence of the installment contract states that "[y]ou, the buyer may buy the vehicle [identified] below for cash or credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract". Id. It then identifies the vehicle and the purchase terms, including the cash price, the sales tax, the cost of the extended warranty and all related fees and charges associated with the purchase. In a section near the bottom, entitled "No Cooling Off Period", the contract indicates that state law does not provide a cooling off period or cancellation period "for this sale". Id.

The next provision states that "[t]his contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be writing and we must sign it". Id. The installment contract is signed by both Diaz and Benstock on behalf of Paragon. There are a litany of other terms and conditions on the reverse side of the installment contract. Id. The vehicle's prior use as a rental vehicle is not disclosed anywhere in the installment agreement.

The final document, the bill of sale, contains Paragon's attempt at complying with the disclosure requirement. Concededly, the disclosure would put a buyer on notice of the vehicle's rental history at the point the buyer is given the bill of sale. But the bill of sale is nothing more than a receipt and, in this case, was the last document presented to Diaz. All other documents had been signed and Diaz had already given Paragon $6,000 in cash when the bill of sale was presented to Diaz. Diaz Dep., p. 31.

24

The bill of sale, unlike the buyer's order and installment contract, has none of the indicia of being any sort of contract or agreement. Cf. Exhibits 2, 3 and 9. There are no terms or conditions on either the front or back of the document. But most compelling, the bill of sale is not signed by Paragon, nor does it even have a space for Paragon to sign as the seller. It is an invoice, a receipt, not a contract. It summarizes the transaction– it is not the transaction. Exhibit 9.

The regulations enacted require that a car's prior rental history be disclosed in the contract of sale. There are two documents in this case which could qualify as contracts of sale and both have merger clauses indicating the terms contained therein represent the entire agreement. Exhibit 2 and Exhibit 3.

Paragon's failure to comply with the disclosure requirements– and its attempt to circumvent meaningful disclosure– is significant. By omitting the disclosure in both the buyer's order and installment contract, it allowed Paragon to give the consumer the false impression that there was nothing to disclose about this car. A sizeable $6,000 downpayment was given, and then the installment contract was presented for signature. Diaz's testimony was unequivocally clear in that the bill of sale, containing the disclosure, was the last document shown to him. This Court must not allow a car dealer like Paragon to make up their own disclosure methods. Paragon's use of its own disclosure form, in a document that is not the contract of sale, put Paragon in a position with tremendous leverage. It had Diaz's $6,000 in cash and a signed installment contract obligating him to pay an additional $21,000 over 5 years.

Thus, this Court must only determine whether Paragon made the disclosure in the "form prescribed by the commissioner" of DMV, and codified in the regulations, and whether such disclosure was made in the contract of sale. If this Court finds that the disclosure did not comply

25

with the form required under the regulations, or that it was not in the contract of sale, Paragon is liable under Vehicle & Traffic Law § 417-a.

## V.    **CONCLUSION**

Diaz is entitled to judgment as to liability on his claims under TILA, ECOA and New York's rental-car disclosure law, V&T § 417-a.

In its zeal its maximize its profits, Paragon engaged in a series of deceptive and misleading acts, including making outright misrepresentations. Paragon was unable, however, to cover its tracks and comply with the various federal and state statutes that protect consumers against such acts.

The price of the car that Diaz purchased was $13,495. It was advertised at that price in the Daily News the day before Diaz entered into an agreement to buy the car from Paragon. But for some reason, Diaz ultimately "agreed" to pay $16,590 for the car. Diaz's explanation for the discrepancy was that he was told that he did not qualify for the advertised price because he did not get approved by a primary lender. Paragon's current explanation for the price increase is that Diaz was unaware of the advertised price and must have simply agreed to pay the price of the car as shown on the window sticker. Benstock Dep., pp. 67-68, 75-76. There is no evidence at all, however, that the car had any window sticker or marking indicating the "non-sale" price. And how does one explain the amazing coincidence that Diaz was unaware of the advertised price but just happened to have a copy of the advertisement?

Diaz obviously was aware of the advertised price and purchased the car based on the ad. He must have been told some story which lead him to ultimately purchase the car at a higher price. And the story he was told is the same story that appears in the advertisement– that the prices advertised

26

are subject to primary lender approval. Thus, as the price of the car was increased as a result of Diaz's need to obtain subprime financing, this increase is an incident to the extension of credit and should have been, but was not, disclosed as a finance charge. This violates TILA.

Similarly, the price of the car was raised a second time when Paragon realized that Americredit charged a higher bank fee than the bank that was initially going to fund the transaction. The documents prepared in anticipation of the CPS deal show a lower purchase price and a lower bank fee. When Paragon's general manager was asked to explain the price increase between the CPS deal and the Americredit deal, he responded that the only "plausible reason" is the higher bank fee. Unwilling to cut into its profits on the Americredit deal, Paragon raised the price of the car in order to recoup the bank fee. As such, it's a finance charge that was required to be disclosed as such but was not.

Paragon also violated the ECOA by failing to notify Diaz, in writing, that adverse actions were taken on his credit application. At least two such actions were taken. First, Paragon unilaterally determined that Diaz would not be approved by a primary lender and, thus, did not submit his application to a primary lender for consideration. Secondly, Diaz was rejected by at least one bank, Condor Capital, and was advised by another, Drive Financial, that his application was incomplete. Both trigger adverse actions notifications to be provided. The ECOA clearly provides that a denial of credit on the terms requested is an adverse action. There can be little doubt that Diaz's intention was to seek financing sufficient to qualify for the advertised price. Paragon's refusal to even submit the application is a denial of credit.

Finally, Paragon also violated New York's required disclosure for used cars that were previously used as rental cars. Rather than using the language and form required by the regulations,

27

and which already appeared in the buyer's order, Paragon chose its own procedure and language for making the disclosure. This procedure and language, however, allowed Paragon to make the disclosure after Diaz had bought the car. He was in no position to negotiate after he had given Paragon $6,000 in cash and signed the installment contract and other documents. Since the disclosure does not comply with the statute and regulations, Paragon is liable.

Therefore, this Court should award Diaz judgment as to liability on counts I, II, and VII. Diaz will present his proof on damages at the trial of the remaining claims.


Dated: April 12, 2005
       New York, New York


                              SADIS & GOLDBERG, LLC


                              By:      Dennis R. Hirsch, Esq. (DRH 3725)
                              Attorneys for Plaintiff
                              463 Seventh Avenue, 16th Floor
                              New York, New York 10018
                              (212) 947-3793

SHORT FORM ORDER

INDEX No.     01-12731

SUPREME COURT - STATE OF NEW YORK
D.C.M.-J PART - SUFFOLK COUNTY          **COPY**

## *PRESENT:*

Hon.     ROBERT W. DOYLE
         Justice of the Supreme Court

MOTION DATE _____ 12/10/01
ADJ. DATE _____ 1/17/02
Mot. Seq.     #001 - MOT D
              #002 - MD

--------------------------------------------------------------X

MICHAEL A. CULLEN,

                         Plaintiff,

- against -

NORTHPORT FORD, INC.

                         Defendant.

--------------------------------------------------------------X

SADIS & GOLDBERG, LLC
Attorneys for Plaintiff
463 Seventh Avenue, 16th Floor
New York, New York 10018

SARISOHN, SARISOHN, CARNER
LeBOW, BRAUN & SHIEBLER
Attorneys for Defendant
350 Veterans Memorial Highway
Commack, New York 11725-0166

      Upon the following papers numbered 1 to __35__ read on plaintiff's motion for partial summary judgment and defendant's cross motion for summary judgment; Notice of Motion/ Order to Show Cause and supporting papers __1 - 7__; Notice of Cross Motion and supporting papers __17 - 23__; Answering Affidavits and supporting papers __8 - 12__; Replying Affidavits and supporting papers __13 - 16__; Other: plaintiff's answer 24 - 30 _&_ defendant's reply 31 - 35 ; (and after hearing counsel in support and opposed to the motion) it is,

      **ORDERED** that this motion (#001) by plaintiff for partial summary judgment with respect to the eighth and ninth causes of action in his complaint on the issue of liability is granted in part and denied in part; and it is further

      **ORDERED** that this cross-motion (#002) by defendant for summary judgment is denied as moot.

      This action was commenced to recover damages for, *inter alia*, breach of written warranty, breach of implied warranty, breach of warranty of serviceability, violation of New York State General Business Law ("GBL") §§ 198-b and 349, fraud, fraudulent inducement, and violation of New York State Vehicle and Traffic Law ("V&T") § 417-a stemming from plaintiff's purchase on November 17, 2000 of a used 1999 GMC Jimmy ("Jimmy") automobile from defendant. Plaintiff alleges that he was drawn to defendant because of an advertisement in a newspaper which called attention to a "repossessed/off-lease sale." Plaintiff maintains that he went to defendant's dealership and asked to be shown vehicles that were part of the sale. Plaintiff asserts that he was shown the Jimmy and subsequently agreed to purchase the automobile. He alleges that he was never told or made aware of the fact that the Jimmy was previously

Cullen v Northport Ford
Index No. 12731-01
Page No. 2

used as a rental car, and not an off-lease or repossessed vehicle. Plaintiff states in his complaint that he began experiencing problems with the vehicle immediately after accepting delivery and requested the defendant either accept the return of the Jimmy for a full refund or exchange it for another comparable automobile. Plaintiff alleges that defendant refused to take back the Jimmy.

Plaintiff now moves for partial summary judgment, pursuant to CPLR 3212(e), seeking judgment against defendant as to liability only with respect to those causes of action sounding in violation of V&T § 417-a and violation of GBL § 349. Plaintiff argues that defendant failed to include in the contract of sale between the parties the necessary disclosure whereby an automobile dealer, if they have reason to know that a particular vehicle's prior use was as a rental car, must, in a conspicuous manner, make the potential buyer aware of that fact. Plaintiff further alleges that defendant intentionally attempted to mislead plaintiff by orally characterizing the Jimmy as "off-lease." Plaintiff maintains that this constituted a deceptive and unfair business practice which is prohibited by GBL § 349. In support of his motion plaintiff submits a copy of the pleadings, a copy of the advertisement which allegedly drew plaintiff to defendant's business, a copy of a purchase agreement, a copy of the contract of sale between the parties, and a "Carfax" report which indicates the Jimmy's prior use as a rental car.

In opposition to the motion for partial summary judgment defendant maintains that plaintiff was told of the Jimmy's prior use and was given written notice to that effect. Defendant argues that plaintiff signed the purchase agreement which contained a paragraph indicating that the Jimmy's prior use was possibly as a rental car. Defendant submits the purchase agreement along with certain receipts indicating the absence of mechanical defects in the Jimmy. The purchase agreement contains a sentence, set off within a box, located just above the plaintiff's signature which states, "If this box is checked, the vehicle's principal previous use included rental or lease service or police." The box is checked.

On a motion for summary judgment, the moving party has the burden of making a prima facie showing of entitlement to summary judgment as a matter of law, and must offer sufficient evidence to show the absence of material issues of fact. If the moving party fails in meeting this burden, summary judgment must be denied. If, however, this burden is satisfied, then the burden shifts to the opposing party, who must establish the existence of material issues of fact requiring a trial (see, *Romano v St. Vincent's Medical Center,* 178 AD2d 467, 577 NYS2d 311 [1984]). In order to grant summary judgment, it must clearly appear that no material issue of fact has been presented. Issue finding rather than issue determination is the key (see, *Schulz v Esposito,* 210 AD2d 307, 619 NYS2d 774 [1994]). Since summary judgment is the procedural equivalent of a trial, if there is any doubt as to the existence of a triable issue of fact, or where the material issue of fact is "arguable", summary judgment must be denied (see, *Salino v IPT Trucking,* 203 AD2d 352, 610 NYS2d 77 [1994]).

With respect to plaintiff's motion for partial summary judgment on his eighth cause of action alleging a violation of GBL § 349, plaintiff argues that he asked a salesperson at defendant dealership to see "off-lease" vehicles. Plaintiff maintains that he was never advised that the Jimmy was previously used as a rental vehicle. Plaintiff alleges that the salesperson's misrepresentations about the Jimmy's prior use constitute a deceptive business practice and were misleading in a material way.

Cullen v Northport Ford
Index No. 12731-01
Page No. 3

In opposition the dealer argues that the plaintiff's complaint is bereft of any allegations pertaining to plaintiff's alleged reliance on defendant's advertisement for the sale of "off lease and repossessed vehicles", nor does the complaint allege any specific misrepresentation that the Jimmy was an "off-lease" vehicle. Defendant further maintains that plaintiff effectively waived any potential claims relating to GBL § 349 when he failed to complain of any defects in the Jimmy until the commencement of this action.

The essential elements of a cause of action alleging consumer fraud in violation of GBL § 349 are that the defendant engaged in a consumer-oriented misleading practice and that the plaintiff was injured thereby (*Negrin v Norwest Mtg., Inc.*, 263 AD2d 39, 700 NYS2d 184 [1999]). In the instant case although defendant did not provide plaintiff with the exact wording of 15 NYCRR 78.13(g), it is obvious there was an attempt to at least make plaintiff aware that the Jimmy's previous principal use was possibly as a rental vehicle. Whether defendant's acts constituted a misleading action is an issue of fact for the jury to consider and as such is not susceptible to resolution on a motion for summary judgment (*see*, *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, N.A.*, 85 NY2d 20, 623 NYS2d 529 [1995]). Consequently, plaintiff's motion for partial summary judgment with respect to his eighth cause of action is denied.

Next, with respect to plaintiff's motion for summary judgment on his ninth cause of action alleging a violation of V&T §417-a, that statute provides at subsection (1),

> "Certificate of prior use by dealer. (a) Upon the sale or transfer of title by a dealer of any second-hand passenger motor vehicle, the dealer shall execute and deliver to the buyer an instrument in writing in a form prescribed by the commissioner which shall set forth the nature of the principal prior use of such vehicle when the dealer knows or has reason to know that such use was as a taxicab, rental vehicle, police vehicle, or vehicle which has been repurchased pursuant to either section one hundred ninety-eight-a or one hundred ninety-eight-b of the general business law, a similar statute of another state, or an arbitration or alternative dispute procedure." (Emphasis added.)

The form prescribed by the commissioner is codified in 15 NYCRR 78.13(g), entitled "Prior Use Certificates." It provides in paragraph (1),

> The statement shall read as follows: "Prior Use Certification (required by Vehicle and Traffic Law, section 417-a if the principal prior use of the vehicle were as a police vehicle, taxicab, rental vehicle, or driver education vehicle). The principal prior use of this vehicle was: a police vehicle _____, a taxicab _____, a rental vehicle _____, or a driver education vehicle_____."

Cullen v Northport Ford
Index No. 12731-01
Page No. 4

Furthermore, V&T § 417-a(3) states, "Violation. The failure of a dealer to deliver to the buyer the instrument required by this section or the delivery of an instrument containing false or misleading information shall constitute a violation of this section."

The notice provided by the dealer in the instant case does not comply with the requirements contained in either V&T § 417-a(1) or 15 NYCRR 78.13(g). The notice provided by the dealer does not provide a space to indicate specifically whether the vehicle's prior use was as a police car, or as a rental car, or as a taxicab, and no where in the dealer's notice is there an opportunity for the dealer to indicate that the prior use may have been as a driver education vehicle. The defendant's general notice that the Jimmy's "principal previous use included rental or lease service or police" is inadequate. Consequently, plaintiff's motion for partial summary judgment with respect to his ninth cause of action is granted on the issue of liability.

Accordingly, plaintiff's motion for partial summary judgment is granted with respect to his ninth cause of action and denied with respect to his eighth cause of action. Having determined that the defendant is liable for violating V&T § 417-a, the parties are directed to proceed with discovery as to the issue of damages.

Dated: **MAR 0 4 2002**

_____
J.S.C.

_____ **FINAL DISPOSITION**     X   **NON-FINAL DISPOSITION**