UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

EDDIE M. DIAZ,

                Plaintiff,

-against-

PARAGON MOTORS OF WOODSIDE,
INC. and AMERICREDIT FINANCIAL
SERVICES, INC.,

                Defendants.

-----------------------------------------------------------X

Case No. CV-03-6466 (CPS)(SAC)

NOTICE OF MOTION

      **PLEASE TAKE NOTICE**, that upon the pleadings, the parties' respective deposition transcripts, the joint exhibits submitted herewith, and plaintiff's accompanying memorandum of law, as well as plaintiff's Local Rule 56.1 Statement of Uncontested Facts, plaintiff Eddie M. Diaz will move this Court, before the Honorable Charles P. Sifton on a date to be determined by the Court, as follows:

1. To grant judgment to the plaintiff, as to liability only, on counts I, II and VII of the complaint against defendant Paragon Motors of Woodside, Inc., pursuant to FRCP Rule 56(a); and

2. To sever and bifurcate all remaining claims and causes of action, as well as damages under counts I, II and VII, pursuant to FRCP Rule 56(d).

Please take further notice that answering papers must be served upon the undersigned in accordance with the briefing schedule issued by the Court.

00003700.WPD

Dated: New York, New York
April 12, 2005

                                              Dennis R. Hirsch (DRH-3725)
                                              SADIS & GOLDBERG, LLC
                                              Attorneys for Plaintiff
                                              463 Seventh Avenue, 16th Floor
                                              New York, New York 10018
                                              (212) 947-3793

To:    Craig Bonnist, Esq.
        Bonnist & Cutro LLP
        31 Purchase Street, Suite 3-1
        Rye, New York 10580

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------X

EDDIE M. DIAZ,

          Plaintiff,

-against-

PARAGON MOTORS OF WOODSIDE,
INC. and AMERICREDIT FINANCIAL
SERVICES, INC.,

          Defendants.

-------------------------------------------------------X

Case No. CV-03-6466 (CPS)(SAC)

PLAINTIFF'S LOCAL RULE 56.1
STATEMENT OF FACTS

### PLAINTIFF'S LOCAL CIVIL RULE 56.1 STATEMENT IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Eastern District of New York, and in support of plaintiff's motion for partial summary judgment, plaintiff respectfully submits this statement of material facts as to which it is contended that there exist no genuine issues to be tried:

1. Defendant, Paragon Motors of Woodside, Inc. ("Paragon"), is a dealer of new and used cars. Paragon Answer, par. 4; Exhibit 1.

2. Paragon placed an advertisement in the Daily News on May 8, 2003 offering certain used cars for sale. Exhibit 1.

3. Included in that advertisement, Paragon offered for sale a 2002 Chrysler Town & Country

1

LX minivan for the price of $13,495. Exhibit 1.

4. The Town & Country advertised was identified by "stock number" 107444R. Exhibit 1.

5. Paragon purchased the Town & Country from Enterprise Rental Cars and, as such, knew that the vehicle's principal prior use was as a rental car. Benstock Dep., p. 128.

6. The advertisement listing the vehicle, however, made no mention of the vehicle's rental history. Exhibit 1.

7. In response to this advertisement, plaintiff Eddie M. Diaz went to Paragon on May 9, 2003 inquiring about the vehicle with stock number 107444R (the "vehicle"). Diaz Dep., p. 11.

8. Diaz agreed to purchase the vehicle from Paragon and provided, as a downpayment, $500 on May 9, 2003. Paragon Answer, par. 7; Exhibit 2 (the "buyer's order").

9. Diaz and Paragon signed a buyer's order reflecting Diaz's purchase of the vehicle on May 9, 2003. Exhibit 2.

10. The buyer's order identifies the vehicle being purchased as stock number 107444R and the salesperson as "Majid". Exhibit 2.

11. The parties agreed that Paragon would assist Diaz in arranging financing for the purchase of the vehicle. Paragon's Answer, par. 9.

12. Paragon, like most car dealers, assist their customers in obtaining financing by submitting customer's credit applications to third-party lenders. Benstock Dep., p. 19; Rivera Dep., p. 14.

13. These third-party lenders then either pre-approve a transaction or decline to finance a transaction. Benstock Dep., pp. 20-21.

14. If a deal is pre-approved by a lender, Paragon will then enter into a retail installment contract

with the consumer, identifying Paragon as the "creditor". Exhibit 3.

15. The purpose of the pre-approval is to ensure that Paragon will be able to sell, or assign, the installment contract following execution. Benstock Dep., pp. 87, 89.

16. As a means of submitting credit applications to lenders, Paragon places information about the consumer and the proposed transaction on a closed internet system known as Dealer Track. Rivera Dep., pp. 14-16.

17. The Dealer Track system allows the submitting dealer to indicate which banks the credit application or proposed transaction gets sent to. Rivera Dep., pp. 20-21.

18. Paragon determines whether a particular consumer, or transaction, should be submitted to prime lenders or subprime lenders. Benstock Dep., pp. 19-23.

19. Paragon may also submit a "payment call" over Dealer Track. A payment call is an inquiry relating to the maximum monthly payment a bank may approve for a particular consumer. Payment calls do not indicate the purchase price of the car, the amount of any downpayment, or the amount to be financed (the "deal structure"). Rivera Dep., p. 37.

20. On May 9, 2003, Paragon submitted a payment call on behalf Diaz to several lending institutions. Paragon Answer, par. 25; Exhibit 4.

21. In response to that payment call, a bank named "CPS" provided a "precheck", or pre-approval, for a loan to Diaz with monthly payments not to exceed $350. Exhibit 5.

22. The CPS pre-check contained certain conditions which were required to be met before CPS would agree to fund the transaction. Exhibit 5.

23. These conditions included, among others, an income and employment verification and an acquisition fee of $199. Exhibit 5.

24. Another bank, Condor Capital, declined the transaction, and would not approve Diaz's credit application or approve him on the payment call. Exhibit 6.

25. Paragon prepared a series of documents necessary to complete the purchase based on the terms approved by CPS. For example, Paragon prepared a retail installment contract which it expected to be assigned to CPS (Exhibit 10); a bill of sale (Exhibit 11); a "dealer worksheet" (Exhibit 12); and a "posting sheet" (Exhibit 13).

26. The dealer worksheet is an internal document prepared by Paragon designed to assist in preparation of the installment contract and bill of sale. It identifies the purchase price of the car, the cost of any additional items purchased (e.g., an extended warranty) and other fees and charges. The dealer worksheet also identifies the name of the bank that approved the transaction and the terms of the approval, including the interest rate and length of the loan. Benstock Dep., p. 80-81; Exhibit 12.

27. The posting sheet is a similar internal document, except it is prepared after the transaction has closed, and identifies the profits realized on a particular sale so that the salespersons' commissions can be calculated. Benstock Dep., p. 80-81; Exhibit 13.

28. No transaction was ever completed based on the CPS pre-approval. Benstock Dep., p. 97.

29. Diaz returned to Paragon on May 10, 2003 and provided an additional $1,000 towards the purchase price. Paragon Answer, par. 10; Diaz Dep., pp. 24, 27-28.

30. Diaz was contacted on May 11, 2003 and was told that the bank required a downpayment of more than $4,000 and that he would have to make a total downpayment of $6,000. Diaz Dep., pp. 27-28.

31. Diaz then returned on May 12, 2003 with an additional $4,500, bringing his total

downpayment to $6,000. Paragon Answer, par. 10; Diaz Dep., pp. 24, 27-28.

32. On May 12, 2003, three days after CPS provided the pre-approval, Americredit provided a pre-approval based on the credit application submitted by Paragon. Exhibit 7.

33. In addition, Drive Financial notified Paragon that Diaz's credit application was incomplete. As such, it neither approved nor declined his application. Exhibit 8.

34. Americredit approved Diaz for a loan in the amount of $14,050, for a term of 60 months. The monthly payments under the approved deal structure were $367.95. Exhibit 7.

35. In addition, Americredit required an acquisition fee of $495 as a condition to accepting assignment of any such credit agreement. Exhibit 7.

36. Americredit's approval was based on a credit application, not just a payment call. Rivera Dep., p. 98.

37. Following Americredit's pre-approval, Diaz returned to Paragon to sign the closing paperwork and take delivery of the vehicle. Diaz Dep., pp. 31-33.

38. In order to complete the purchase, Diaz signed a number of documents including a retail installment contract and a bill of sale. Exhibits 3 and 9.

39. Paragon also prepared a dealer worksheet and posting sheet based on the terms of the Americredit deal structure. Exhibits 14 and 15.

40. The bill of sale contains a disclosure indicating that the principal prior use of the vehicle was a rental car. Exhibit 9.

41. No such disclosure was made on the buyer's order dated May 9, 2003, despite a section of the form devoted to making such disclosures. Exhibit 2.

42. The bill of sale which contained the rental car disclosure was the last document presented

5

to Diaz for signature. Diaz Dep., p. 31.

43. The bill of sale lists the purchase price of the vehicle at $16,590 even though the advertised price of the vehicle was $13,495. Exhibit 9 and Exhibit 1.

44. The advertisement states that the prices listed for vehicles in the advertisement are for those buyers who finance their purchases and are approved by a "primary lender". Exhibit 1.

45. Paragon's general manager, Brian Benstock, testified that the prices listed in the advertisement were also available for those buyers who did not need financing and who would be paying cash. Benstock Dep., p. 64.

46. With respect to the indirect financing of car purchases, a primary lender is one that takes assignment of consumer credit agreements involving consumers with good credit. A subprime lender is one who takes assignment of credit agreements involving consumers with below average credit. Benstock Dep., p. 19-21.

47. Primary lenders allow car dealers to mark up the interest rate when entering into credit agreements with consumers. Thus, if a lender approves a consumer for a loan at 5%, the dealer may sell that loan to the consumer at 8%. The dealer and the bank then split the money realized from the additional 3% in the loan. The interest rate approved by the bank is referred to as the "buy rate" and the spread between the buy rate and the rate ultimately sold to the consumer is known as a "finance reserve". Benstock Dep., pp. 89-90, 118-119.

48. Subprime lenders often do not allow finance reserves and dealers may not make a profit when selling or assigning a credit agreement to a subprime lender. Benstock Dep., pp. 118-119.

49. In the pre-approvals provided by both CPS and Americredit, Paragon was unable to mark up

the interest rate and, therefore, could not make any profit by selling Diaz's credit agreement. Benstock Dep., pp. 89-90, 118.

50. In May, 2003, Diaz had below average credit due, at least in part, to a bankruptcy filed approximately two years prior. Diaz Dep., p. 49.

51. In attempting to assist Diaz in obtaining financing for the vehicle, Paragon pulled Diaz's credit report. Benstock Dep., p. 145; Exhibit 4.

52. Upon a review of Diaz's credit report, Paragon determined that Diaz would not qualify for approval by a primary lender and failed to submit any credit application to a primary lender. Benstock Dep., p 19-21; 146-147.

53. At least one of the subprime lending institutions that Paragon did submit Diaz's credit application to refused to extend credit to Diaz. Paragon Answer, par. 27.

54. Paragon did not provide any written notification to Diaz that some of these lending institutions had declined to extend credit to Diaz. Benstock Dep., p. 142.

55. Paragon did not provide any written notification to Diaz that Paragon had determined not to submit Diaz's credit application to any primary lenders. Benstock Dep., p. 142.

Dated: New York, New York
April 11, 2005

By: Dennis R. Hirsch, Esq. (DRH-3725)
SADIS & GOLDBERG LLC
Attorneys for Plaintiff
463 Seventh Avenue, 16th Floor
New York, New York 10018
(212) 947-3793

## CERTIFICATE OF SERVICE

I, Dennis R. Hirsch, an attorney duly licensed in the State of New York, am not a party to this action and certify that on April 12, 2005, I served a copy of the annexed **Notice of Motion, Local Rule 56.1 Statement of Facts, the Parties' Joint Exhibit Package, and Plaintiff's Memorandum of Law,** upon counsel for the defendants by sending a copy of the above documents via Federal Express overnight mail to the address listed below.

> BONNIST & CUTRO, LLP
> Attorneys for Defendants
> Paragon Motors of Woodside, Inc.
> And Americredit Financial Services, Inc.
> 31 Purchase Street, Suite 3-1
> Rye, New York 10580

Dennis R. Hirsch (DRH 3725)