UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X

Eddie M. Diaz,

                              Plaintiff,          CV-03-6466 (CPS)

    - against -                                   MEMORANDUM OPINION
                                                  AND ORDER
Paragon Motors of Woodside, Inc. and
Americredit Financial Services, Inc.

                              Defendants.

--------------------------------------X


     Eddie Diaz brings this action against Paragon Motors of

Woodside, Inc. ("Paragon") and Americredit Financial Services,

Inc. ("Americredit") alleging that defendant Paragon Motors

violated (1) the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et

seq.*,[1] (2) the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §

1691,[2] (3) New York's Vehicle & Traffic Law § 417-a,[3] (4) New

York's "Used Car Lemon Law," New York General Business Law § 198-

---

[1] Pursuant to 15 U.S.C. § 1640, an individual bringing a TILA claim may
recover: 1) actual damages; 2) twice the amount of any finance charge in
connection with the transaction, not less than $100 nor greater than $1,000;
3) costs of the action, together with a reasonable attorney's fee as
determined by the court.

[2] An individual bringing suit under ECOA may be entitled to actual damages,
punitive damages up to $10,000, equitable and declaratory relief, as well as
costs and attorney's fees. 15 U.S.C. § 1691e.

[3] Pursuant to NY V&T § 417-a, an individual "may bring an action to recover
damages. Judgment may be entered for three times the actual damages suffered
by a consumer or one hundred dollars, whichever is greater. A court also may
award reasonable attorneys' fees to a prevailing plaintiff buyer." N.Y.
Vehicle and Traffic Law § 417-a.

b,[4] (5) the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310,[5] by breaching (a) express and (b) implied warranties, and (6) New York General Business Law § 349 by its deceptive sales practices.[6]  In addition, plaintiff alleges that (7) co-defendant Americredit is liable for damages on all claims which plaintiff asserts against co-defendant Paragon, pursuant to 16 C.F.R. § 433.2 (the "Holder Rule"), as a provider of consumer credit. Presently before the Court is the plaintiff's motion for partial summary judgment on Paragon's liability with respect to its TILA, ECOA and NY V&T § 417-a claims. Also before the Court are Paragon's and Americredit's cross-motions for summary judgment on all claims alleged in the complaint.

---

[4] If a dealer fails to honor the warranty as provided in NY GBL § 198-b, "the dealer shall accept return of the used motor vehicle from the consumer and refund to the consumer the full purchase price."  N.Y. General Business Law § 198-b(c)(1).

[5] Consumers may recover "a sum equal to the aggregate amount of cost and expenses (including attorneys' fees) . . . unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate." 15 U.S.C. § 2310(d).

[6] "In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff."  McKinney's General Business Law § 349(h).

For the reasons set forth below, plaintiff's Rule 56(b) motions for summary judgment on liability with respect to his TILA and NY V&T § 417-a claims are granted. Plaintiff's motion for summary judgment as to his ECOA claim is denied. Paragon's motions for summary judgment are granted with respect to plaintiff's claims for violations of ECOA, Used Car Lemon Law, Breach of Express Warranty pursuant to the MMWA, and the New York Deceptive Sales Practice statute to the extent that claim is based on violations of ECOA. Paragon's motions for summary judgment are denied as to plaintiff's claims for violations of Breach of Implied Warranty and Revocation of Acceptance pursuant to the MMWA, and the New York Deceptive Sales Practice statute to the extent that claim is based on violations of TILA and NY V&T § 417-a. Americredit's motions for summary judgment are granted with respect to plaintiff's claims for violations of TILA, ECOA, Used Car Lemon Law, Breach of Express Warranty pursuant to MMWA, and the New York Deceptive Sales Practice statute to the extent premised on violations of ECOA. Americredit's motions for summary judgement are denied with respect to plaintiff's claims for violations of NY V&T § 417-a, Breach of Implied Warranty and Revocation of Acceptance pursuant to MMWA and the New York

Deceptive Sales Practice statute to the extent these violations are premised on violations of TILA and § 417-a.

## BACKGROUND

The following facts are drawn from the parties' Local Rule 56.1 statements, affidavits, depositions, and exhibits submitted in connection with these motions.  They are undisputed except where noted.

On May 9, 2003, plaintiff Eddie Diaz visited Paragon's used car dealership at 57-02 Northern Boulevard, Woodside, New York in Queens County.  Diaz told Paragon's salesman that he was interested in purchasing a used 2002 Chrysler Town and Country advertised in the New York *Daily News* on May 8, 2003 for sale at a purchase price of $13,495.00.[7]  Plaintiff made a deposit of $500.00 towards the purchase of the car in order to assure its availability.  He also signed a document listing "$4,000 Cash Down" in the space provided for price, under which was written, "Subject to Bank Approval", but with no total vehicle price or other fees listed.  (Joint Ex. 2).  The document, variously described as an "initial intent to buy", "customer's intention to

---

[7] The advertisement included the following disclaimer, "Price/Payments exclude tax & MV fees. Price/Payments based on approval by primary lender. Late or derogatory credit may affect monthly payments, down payment, financing rate and amount financed.  Credit approval based on prime lending source, bankruptcies must be discharged.  Must show proof of employment.  5 Day Exchange for an in stock vehicle only. Offers can not be combined."  (Joint Ex. 1).

buy" or "a buyer's order" by Paragon, (Benstock Dep., 26, 32-33, 43), included a description of the vehicle, its stock and VIN numbers, mileage of 30,540, and a notation of the $500 deposit. A form intended to disclose by checked boxes prior use of the vehicle as a police vehicle, taxi-cab, driver education or rental vehicle as required by Vehicle and Traffic Law § 417-a,[8] was left blank. (Joint Ex. 2; Benstock Dep., 36).

At the time, the parties agreed that Paragon would assist

---

[8] NY V&T § 417-a provides that

> Upon sale or transfer of title by a dealer of any second-hand passenger motor vehicle, the dealer shall execute and deliver to the buyer an instrument in writing in a form prescribed by the commissioner which shall set forth the nature of the principal prior use of such vehicle when the dealer knows or has reason to know that such use was as a taxicab, rental vehicle, police vehicle. . .

N.Y. Vehicle and Traffic Law § 417-a.

The Regulations of the Commissioner provide that

> This statement shall be conspicuously printed, typed or stamped on the dealer's contract of sale, and the appropriate line checked, and given to the purchaser before the purchaser signs it. . . [f]ailure to check a line shall mean that the dealer does not know or has no reason to believe that the principal prior use of the vehicle was as a police vehicle, taxicab, rental vehicle or driver education vehicle. If a dealer uses an oral contract for the purchase of a secondhand passenger motor vehicle, he shall deliver to the purchaser a written statement concerning the prior use of the motor vehicle before accepting payment of a deposit from the purchaser.

15 NYCRR 78.13(g)(1).

Diaz in financing the car.[9]  Paragon thereafter submitted Diaz's

loan application via an electronic data system called Dealer

Track to determine whether Diaz was eligible for financing by a

sub-prime lender, and at what amount.[10]

On the same day, May 9, Consumer Portfolio Services, Inc.

(CPS), a sub-prime lender, pre-approved a loan to Diaz subject to

certain conditions, including income and employment verification

and payment by Paragon of an acquisition fee of $199 later

charged to Diaz.  The pre-approval provided for a maximum payment

per month of $350, at an annual interest rate of 19.95%.  (Joint

Ex. 5).  Based on these terms, Paragon set a selling price of

$16,130.13, with CPS to provide financing.  Additional charges

---

[9]  The document provides in this connection, "[i]f you [Paragon] agree to
assist me [Diaz] in obtaining financing for any part of the purchase price,
this order shall not be binding upon you or me until all of the credit terms
are presented to me in accordance with Regulation "Z" (Truth-in-Lending) and
are accepted by me.  If I do not accept the credit terms when presented, I may
cancel this order and my deposit will be refunded."  (Joint Ex. 2).

[10]  According to the deposition testimony of a regional manager for defendant
Americredit, a call for bids is sent electronically by the dealer to banks via
a website called Dealer Track.  This allows banks selected by the dealer to
bid on the loan application. (Rivera Dep., 37).  The salesperson and finance
manager who handled Diaz's transaction have not been deposed, but according to
Brian Benstock, General Manager of Paragon, it was Paragon's practice at the
time to decide whether to submit a customer's application to a primary lender
based on a credit report.  In Mr. Diaz's case, Benstock could not recall
whether the application was submitted to primary lenders, but he concluded
that it would only have been submitted to sub-prime lenders because of his
inferior credit score, a 2001 bankruptcy, and a "$17,179 charge-off to Chase
Manhattan Bank . . . that would immediately disqualify him for approval."
(Benstock Dep., 146-147).  As a result, Paragon submitted Diaz's application
to Dealer Track, which allowed sub-prime lenders to bid on the loan.

included $1,500 for an extended warranty,[11] $1,454.49 in taxes
and $140 in license, title, state inspection and processing fees.
The total selling price listed on the proposed bill of sale,
dated May 10, 2003, was $19,224.62. The down payment was fixed
at $6,000, so the total remaining due would be $13,224.62.
(Joint Ex. 11, Proposed Bill of Sale). Because Diaz would
ultimately send $21,000 in payments to CPS, the total amount
financed was $7,775.38 ($21,000 less $13,224.62), according to a
proposed Retail Installment Contract, also dated May 10, 2003.
(Joint Ex. 10, Proposed Retail Installment Contract). CPS turned
down the loan for unexplained reasons, and it was eventually
picked up by Americredit.

On the following day, May 10, 2003, Diaz again offered to
purchase the car for the advertised price of $13,495, gave an
additional deposit of $1,000.00, and again asked Paragon to
obtain financing. According to Diaz, there were no further
negotiations with respect to the purchase price of the vehicle on
May 10. (Diaz Dep. 26). The next day, May 11, Paragon informed
Diaz that in order to obtain financing, he would have to put

_____

[11] The extended warranty, or vehicle service contract, subsequently purchased
by the plaintiff for $1,800, was provided by a non-party to the dispute, Honda
Care, and covered repairs for 4 years or 60,000 miles. The limited warranty,
provided by Paragon as required by New York's Used Car Lemon Law, covered
repairs for 90 days or 4,000 miles.

$6,000 down, instead of $4,000 as previously provided for in the
May 9 agreement.

Diaz stated that on May 12, 2003, he returned to Paragon to
pay the additional $4,500 requested for the down payment, but did
not execute any documents until the following day.[12] According
to Diaz, on May 13, 2003 he returned to Paragon and executed a
Retail Installment Contract ("RISC"), dated May 12, 2003, which
disclosed the final details of the sale, and reflected an
increase in the purchase price of the vehicle. According to
Diaz, the Paragon finance manager told him that the original
advertised price of $13,495 was not available because a primary
lender would not finance the car, because a secondary lender had
to be used, and because the extended warranty was necessary to
obtain financing. (Diaz Dep., 34-37). Because he was putting
down $6,000, the balance of $14,047.18 was to be financed by
Americredit Financial with 60 monthly payments at $367.87 per
month, equaling $22,072.20. The total finance charge listed in
the RISC was $8,025.02. The "total sale price" for the vehicle
including $16,590 purchase price, $1,517.18 sales tax, $8,025.02

_____

[12] In his deposition, Diaz stated that he was unable to execute any documents
that day because "the financial guy was not available". (Diaz Dep., 28-34).
In the Complaint and later in his deposition, Diaz stated that did not sign
any of the documents until May 13, because of a defect with the vehicle.
(Complaint, ¶¶ 13, 14; Diaz Dep. 54-55).

finance charge, $1,800 extended warranty, and other license, title, state inspection and processing fees was stated as $28,072.20.  (Joint Ex. 3, Retail Installment Contract).

On a bill of sale dated May 12, 2003, but not signed until May 13 according to Diaz, the purchase price was listed as $16,590 plus $1,800 described as "Other Equipment" apparently representing the new price for the extended warranty, $1,517.18 sales tax, and $140.00 for license, title, state inspection and processing fees, for a total cash price of $20,047.18.[13]  (Joint Ex. 9, Bill of Sale).  The bill of sale included a statement, signed by Diaz, that the "principal pride [sic: prior?] use of th[e] vehicle was as a rental vehicle."  (Joint Ex. 9).  Diaz stated the bill of sale was the last document he signed before taking possession of the vehicle.  (Diaz Dep., 32-33).

*The Limited Warranty*

The sale included a limited warranty which covered repairs to covered parts, for 90 days or 4,000 miles.  The warranty provided that the dealer would repair "covered parts listed on the reverse side" of the warranty or would reimburse the buyer

---

[13] The difference in price between the RISC and the bill of sale appears due to the inclusion of finance charges in the RISC.

for such repairs.[14]  The warranty is dated May 10, 2003, but is
not signed by either party.

*The Vehicle Repairs*

A few days after Diaz took possession of the vehicle on May
13, 2003, he complained that the brakes were not responding, the
front wheels made a strange sound upon turning, and that there
were problems with the air conditioning and mirrors.  (Diaz Dep.,
56-59).  On May 20, he brought the vehicle back to Paragon for
repairs to the mirror, ABS light and air conditioning, which were
completed at no charge on May 23.  (Def.'s Mem. Opp'n, Ex. 17).

Diaz brought the car back to Paragon again on May 30 for
repairs to the C/S ABS[15] and brake light, and "the links and
bushings."  According to Diaz, the vehicle was sent to a Chrysler
dealership, and returned about one month later, during which time
Diaz rented another vehicle.  Diaz did not pay for the repairs or
rental vehicle, but stated that he paid $278 for additional
insurance for the rental vehicle, which he did not seek to have

---

[14]  The warranty provides that, "[t]he Dealer participates in an informal
dispute settlement procedure to arbitrate any dispute which may arise under
Section 198-b of the New York General Business Law . . . relating to this
warranty. . . The buyer must resort to this settlement procedure or such
alternate New York State arbitration procedure under the Act before pursuing
any other rights or remedies available under the Act.  The buyer need not
resort to the settlement procedure if he/she seeks to pursue rights and
remedies not created by the Used Car Lemon Law." (Def.'s Mem. Opp'n, Ex. 25).

[15]  Anti-Lock Brake System

reimbursed. (Diaz Dep., 70). The invoice from Bayside Chrysler, Plymouth, Jeep, Inc. describes repairs to the front suspension and ABS light, where "[c]ustomer states noise in front end over bumps" and "that the anti lock [sic] brake light is on and brake light on". *Id*. at Ex. 18. It is unclear from the invoice when the car was received and when it was delivered to Diaz, although it lists the "R.O. Date" as 06/06/03, and an invoice date of 06/27/03. (Def.'s Mem. Opp'n, Ex. 19). Diaz stated that after the car was returned to him the problem with the brake light reoccurred, and on July 10, he returned the vehicle to Bayside Chrysler for further repairs, which were completed that day or the day after at no charge to him. Diaz stated that the vehicle worked properly after these repairs.

After the 90-day warranty had expired, Diaz brought the car to Tony's Auto Body on October 9, 2003, for repairs following an accident in September 2003 (Def's Mem. Opp'n, Ex. 21; Diaz Dep., 89-93). On May 18, 2004, Jochi Auto Repair, Inc. performed work to the "Rear Anti Locks Sensor Installed Left and Right" and "Replace Front [illegible]". On July 20, 2004, Riverdale Chrysler Jeep performed additional repairs to the "check engine light". These repairs were either covered by insurance or Diaz's extended warranty. (Def.'s Ex. 22-23, Diaz Dep., 77-86.)

Plaintiff stated that several times he used the Chrysler for business instead of his other car, because he was concerned that the Chrysler was unsafe.[16] (Diaz Dep., 88). Diaz stated that he informed Paragon that he wanted them to take the vehicle back when he brought it in to be repaired for the second time in May or June of 2003. Paragon's agent did not accept the vehicle, but repaired it instead. (Diaz Dep., 88).

## DISCUSSION

### Jurisdiction

This Court has jurisdiction over plaintiff's TILA and ECOA claims pursuant to 28 U.S.C. §§ 1331 and 1337. Plaintiff contends that this Court has jurisdiction over plaintiff's Magnuson-Moss Warranty claims, pursuant to 15 U.S.C. § 2310(d)(1)(B), but has not alleged that it meets the amount in controversy requirements for jurisdiction in federal court. Nevertheless, this Court exercises supplemental jurisdiction over the warranty claims and plaintiff's remaining state law claims pursuant to 28 U.S.C. § 1367.

### Choice of Law

---

[16] Plaintiff usually drove the other car for business leaving his wife to drive the Chrysler. However, because plaintiff was worried about the Chrysler's safety he drove it and left the other car for his wife.

Where, as here, the parties have relied primarily on New York law, "such 'implied consent . . . is sufficient to establish choice of law.'" *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004)(citations omitted).

<u>Summary Judgment</u>

Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 117 (2d Cir. 2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.*

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a metaphysical doubt as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assoc. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). "[A]n adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P 56(e). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc., v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).

The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

"The contention of one party that there are no issues of material fact preventing entry of judgment in its favor does not bar that party from asserting that there are issues of fact sufficient to prevent the entry of judgment as a matter of law against it." *Walling v. Richmond Screw Anchor Co.*, 154 F.2d 780, 784 (2d Cir.), *cert. denied*, 328 U.S. 870, 66 S.Ct. 1383, 90 L.Ed. 1640 (1946). Thus, the mere filing of cross-motions for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other. *E.g., Home Insurance Co. v. Aetna Casualty & Surety Co.*, 528 F.2d 1388, 1390 (2d Cir. 1976) ("The fact that both sides ... sought summary judgment does not make it more readily available."); *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975). "[T]he mere fact that plaintiff has failed to meet his burden of proof on his motion for summary judgment does not entitle the defendant to judgment

on its motion." *Rothenberg v. Chemical Bank New York Trust Co.*, 400 F.Supp. 1299, 1302 (S.D.N.Y. 1975). Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Board of Ed. of City School Dist. of City of Olean*, 667 F.2d 305, 313-14 (2d Cir. 1981).

Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 128 (2d Cir. 1996), *cert. denied*, 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).

<u>Truth in Lending Act</u> (TILA)

The purpose of the Truth in Lending Act ("TILA")[17] is "to assure a meaningful disclosure of credit terms so that the

---

[17] District courts in the Second Circuit have relied on authorities in other circuits with regards to claims arising under the Truth in Lending Act (TILA) due to the general absence of applicable decisions in this Circuit. *See generally Ringenback v. Crabtree Cadillac-Oldsmobile, Inc.*, 99 F.Supp.2d 199 (D. Conn. 2000).

consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a); *Gibson v. Bob Watson Chevrolet-Geo. Inc.,* 112 F.3d 283, 285 (7th Cir. 1997) (TILA's purpose is "to protect consumers from being misled about the cost of credit"); *Balderos v. City Chevrolet*, 214 F.3d 849 (7th Cir. 2000). To this end, TILA requires clear and accurate disclosures by creditors[18] to consumers of any finance charge that the consumer will bear under the credit transaction. *See* 15 U.S.C. § 1638(a)(4).

TILA defines a "finance charge" as the "sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. §1605(a).[19] However, the Federal Reserve Board's Official Staff

---

[18] For TILA purposes, "A "creditor" is defined as: a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement." *In re Armstrong*, 288 B.R. 404, 412 (Bankr. E.D.Pa. 2003) (citing 15 U.S.C. §1602(f). As Paragon has not disputed its creditor status and as all the evidence suggests Paragon is indeed a creditor, Paragon is treated as a creditor for purposes of this motion.

[19] The regulations implementing TILA employ language essentially identical to the statutory language, defining a "finance charge" as including "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4.

Commentary to Regulation Z[20] exempts "the cost of doing business"

from TILA's disclosure requirements:

> *Costs of doing business*.  Charges absorbed by the
> creditor as a cost of doing business are not finance
> charges, even though the creditor may take such costs
> into consideration in determining the interest rate to
> be charged or the cash price of the property or
> services sold.  However, if the creditor separately
> imposes a charge on the consumer to cover certain
> costs, the charge is a finance charge if it otherwise
> meets the definition.  For example:

> > A discount imposed on a credit obligation when it
> > is assigned by a seller-creditor to another party
> > is not a finance charge as long as the discount is
> > not separately imposed on the consumer.

12 C.F.R. Pt. 226, Supp. I at 308-09.

In this case, Diaz points to three charges which he asserts

were hidden finance charges.  First, Diaz asserts that the price

charged to him in excess of the advertised price was based on the

need to obtain sub-prime financing and thus was a finance charge

in violation of TILA.  Second, he alleges that Paragon incurred a

bank fee for assigning the credit agreement to Americredit and

that because this fee was passed on to Diaz, it constituted a

finance charge.  Finally, Diaz argues that he was required to

purchase an extended warranty as a condition to obtaining

---

[20]  "The official staff opinions of the Federal Reserve Board construing TILA
and Regulation Z are binding on this court unless they are 'demonstrably
irrational.'" *Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927, 931 (7th Cir.
1998)(citing *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980)).

financing and that this additional cost constituted a finance charge requiring disclosure under TILA.

    1.  *Advertised Price Increase:*

    Diaz argues that the increase in price above the advertised price constitutes a hidden finance charge because he was forced to pay the increase based on his need to secure sub-prime financing.

    "An increase in the base price of an automobile that is not charged to a cash customer, but is charged to a credit customer, *solely because he is a credit customer*, triggers TILA's disclosure requirements." *Cornist v. B.J.T. Auto Sales Inc.*, 272 F.3d 322, 327 (6th Cir. 2001)(emphasis in original). "Thus, in order to prevail on her claim that [defendant car dealer] failed to disclose this hidden finance charge, [plaintiff] 'must demonstrate a "causal connection" between the higher price and the extension of credit." *Kilbourn v. Candy Ford-Mercury, Inc.*, 209 F.R.D. 121, 129 (W.D.Mich. 2002)(quoting *Cornist* supra). In this case, the advertised price of the vehicle was $13,495 and Diaz eventually purchased the car for a base price of $16,590.

    Diaz argues that three pieces of evidence demonstrate that the increased cost above the advertised price was caused by his need to obtain sub-prime lending: 1) a statement in the

advertisement that "price/payments [are] based on approval by primary lender" (Joint Ex. 1); 2) Paragon employee's undisputed statement that Diaz did not qualify for the advertised price because he did not secure financing through a primary lender (Diaz Dep., 37); and 3) the testimony of Paragon's general manager that the advertised prices are available to prime financing credit customers and cash customers. (Benstock Dep., 61, 64).

In *Kilbourn* a district court refused to grant summary judgment where a plaintiff purchased a car for more than its advertised price and she testified that two salesmen had told her that the increased cost was due to her "special financing needs" *Kilbourn*, 209 F.R.D. at 130. In that case summary judgment for the plaintiff was not appropriate because the salesmen denied having made such statements. However, in this case, the statements by a Paragon employee and the deposition testimony of Paragon's general manager are undisputed. Further, in *Kilbourn* the advertisement made no mention of an increased cost for non-prime creditors. In this case, the advertisement itself suggests that any cost over the advertised price is incident to obtaining credit.

Paragon presents no evidence to contradict Diaz's assertion that he paid a price higher than the one advertised. Instead Paragon argues, without pointing to any supporting caselaw, that the advertised price did not apply to Diaz because he knew he would require sub-prime lending and would not qualify for the prime lending required by the advertisement.[21] Paragon therefore contends that there was never a base advertised price and as a result no "increase" over this price. Rather, Paragon argues, the price paid by Diaz was simply a result of his bargaining with the salesman.

Paragon's argument is without merit. The advertisement's statement that the advertised price did not apply to sub-prime creditors establishes the base price for cash or prime purchasers. Furthermore, Paragon's general manager testified that the advertised price was the price actually charged to both cash and to prime lender consumers. Although the mere fact that a subprime credit consumer paid more than an advertised price would not in and of itself indicate that his price included a finance charge, *Kilbourn*, 209 F.R.D. at 128, 130 (holding that an

---

[21]Paragon's argument that the advertised price was available only to cash customers or customers who were able to receive prime lender financing arguably concedes that Diaz paid a higher base price for the vehicle solely because he is a sub-prime credit customer, requiring disclosure under TILA. *See Cornist*, 272 F.3d at 327.

increase over the advertised price charged to a credit customer was not a finance charge where car dealership had "sold cars to cash customers for more than the advertised price and ha[d] sold cars to credit customers for less than the advertised price" because of the relative negotiating skills of the parties and where the salesmen did not know if a customer was paying cash or credit until after the negotiation"), in this case the salesman knew that Diaz was a subprime credit customer when he established the price. Thus, any increase over the advertised was caused by the need to obtain credit and had to be disclosed under TILA. Diaz's undisputed evidence that the advertised price was available to cash and prime lender creditors but was not available to him because he required sub-prime lending establishes that he is entitled to summary judgment on his TILA claim.

In the present case defendant paid $16,590 instead of the advertised $13,495. Thus, he paid a finance charge of $3,095. Under 15 U.S.C. §1640 the plaintiff can recover twice the amount of any finance charge in connection with the transaction, not less than $100 nor greater than $1,000. Accordingly, plaintiff has recovered the maximum amount under TILA on his "advertised

price increase claim" and I need not address his bank fee and warranty claims.

Equal Credit Opportunity Act (ECOA)

Plaintiff alleges that Paragon violated the Equal Credit Opportunity Act ("ECOA") by failing to give plaintiff notice that Paragon obtained credit in a different amount and at different terms than Diaz requested. Paragon contends that because plaintiff accepted its counteroffer to provide financing through a sub-prime lender, the decision did not constitute an adverse action as defined by the Federal Reserve Board regulations promulgated to implement ECOA, and accordingly did not require notification.

ECOA requires that "[w]ithin thirty days . . . after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application." 15 U.S.C. § 1691(d)(1).[22] Neither party disputes that Diaz completed a

---

[22] ECOA's purpose is to prevent discrimination in the extension of credit on the basis of race, color, religion, national origin, sex or marital status, or age. 15 U.S.C. § 1691(a)(1). "[T]he notification requirement extends to all applicants," and does not require specific allegations of discrimination. See *Treadway v. Gateway Chevrolet, Oldsmobile, Inc.*, 2002 U.S. Dist. LEXIS 6526, *1 (N.D.Ill. April 10, 2002)(citing *Jochum v. Pico Credit Corp. Of Westbank, Inc.*, 730 F.2d 1041, 1048 (5th Cir. 1984); see also *Bayard v. Behlmann Automotive Services, Inc.*, 292 F.Supp.2d 1181, 1185 (E.D.Mo. 2003).

credit application,[23] which Paragon submitted to Dealer Track to

allow sub-prime lenders to bid on the loan.[24]  Nor does Paragon

argue that it is not a creditor subject to ECOA's notification

requirements.[25]  Thus, the only remaining issues are whether

Paragon's action with respect to Diaz's application required

notice, and if so whether Paragon satisfied this requirement.

"[U]nder ECOA there are three distinct kinds of action a

creditor might take, each triggering a notice requirement: an

approval, a counteroffer, and an adverse action."  *Newton v.*

*United Companies Financial Corp.,* 24 F.Supp.2d 444, 459 (E.D.Pa.

1998)(*citing* 12 CFR § 202.9(a)(1)(i)("A creditor shall notify an

---

[23] Furthermore, the regulations specify that when "the creditor also evaluates information about the consumer, decides to decline the request, and communicates this to the consumer, the creditor has treated the inquiry or prequalification request as an application and must then comply with the notification requirements under § 202.9."  12 CFR Pt. 202, Supp. I, Official Staff Interpretation.

[24] Benstock could not recall whether Diaz's application was submitted to primary lenders, but he concluded that it would only have been submitted to sub-prime lenders because of his inferior credit score, a 2001 bankruptcy, and a "$17,179 charge-off to Chase Manhattan Bank . . . that would immediately disqualify him for approval."  (Benstock Dep. at 146-147).

[25] 15 U.S.C. § 1691a(e) defines creditor as "any person who regularly arranges for the extension, renewal, or continuation of credit."  Regulation B further specifies that, "[c]reditor means a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit".  12 C.F.R. §202.1(l).  As Paragon has not disputed its creditor status for ECOA purposes, and as all the evidence suggests Paragon is indeed a creditor, Paragon is treated as a creditor for purposes of this motion.  It is precisely Paragon's decision to submit plaintiff's credit application to sub-prime rather than primary lenders which is the basis of plaintiff's ECOA claim.

applicant of action . . . concerning the creditor's approval of, counteroffer to, or adverse action on the application.")

The regulations define a counteroffer as an offer to extend credit in a different amount, or on other terms than those requested.[26]  12 U.S.C. § 202.2(c)(1)(i).  The statute defines an adverse action as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested."  15 U.S.C. 1691(d)(6). Federal Regulation B narrows the definition of an adverse action to, "[a] refusal to grant credit in substantially the amount or on substantially the terms requested in an application *unless the creditor makes a counteroffer* (to grant credit in a different amount or on other terms) *and the applicant uses or expressly accepts the credit offered*."  12 C.F.R. § 202.2(c)(1)(i)(emphasis added).  An adverse action does not include a "change in the terms of an account expressly agreed to by an applicant."  12 CFR § 202.2(c). Moreover, "where a creditor's action falls within the definitions of what is adverse action and what is not adverse action, the latter definition is controlling."  *Haynes v. Bank of Wedowee,*

---

[26] A counteroffer is an "offeree's new offer that varies the terms of the original offer and that ordinarily rejects and terminates the original offer." Black's Law Dictionary, 8th Edition, p. 377.

634 F.2d 266, 272 (5th Cir. 1981)(*citing* 12 C.F.R. §
202.2(c)(3)).

Plaintiff first argues that Paragon's decision to send his
credit application to sub-prime lenders constituted an adverse
action which required written notification including a statement
of reasons pursuant to 15 U.S.C. § 1691(d)(2) and 12 C.F.R. §
202.9.

In the present case, plaintiff offered to pay the advertised
price for the vehicle and completed a credit application, which
Paragon submitted to sub-prime lenders via Dealer Track.  When
Paragon informed Diaz that a larger down payment was required to
obtain financing, and before he signed the Bill of Sale and took
possession of the vehicle, Diaz states that Paragon informed him
that the advertised price was not available because Paragon
"couldn't get primary lenders to finance [the] car . . . [and
Paragon] had to go to a secondary lender."  (Joint Exhibits, Ex.
A, Diaz Dep. at 26-28, 37).[27]  The parties do not dispute that
this price constituted a counteroffer to Diaz's offer to purchase
the vehicle at the advertised price, or that Diaz accepted the
terms of the counteroffer when he signed the Retail Installment
Contract. Thus, under the terms of the regulations, Paragon's

[27]    Diaz also stated that he was told that an additional down payment was
required in order to obtain financing. (Joint Exhibits, Ex. A, 27.)

decision to send the application to secondary lenders was not an adverse action, but rather a counteroffer. *See Diaz v. Virginia Housing Development Authority*, 117 F.Supp.2d 500, 506 (E.D.Va. 2000)("the regulations carve out an exception to the definition of 'adverse action' for a denial of credit coupled with a counteroffer that the applicant accepts.")

Plaintiff contends that because the statute and regulations are inconsistent, the regulations should not be given deference. However, the statute itself provides that "any requirement imposed under this subchapter or any provision thereof includes reference to the regulations of the Board," 15 U.S.C. § 1691a(g), and "grants the Board broad authority to 'provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes' of the Act." *Virginia Housing*, 117 F.Supp. 2d at 507(citing 15 U.S.C. § 1691b(a)(1)). Moreover, "[w]here Congress has expressly delegated to an agency the responsibility of articulating standards governing a particular area, the courts must accord the ensuing regulation substantial deference." *Treadway*, 362 F.3d at 976, n.3(citing *Chevron U.S.A., Inc. V. Natural Resources Defense Council*, 467 U.S. 837, 844 (1984)); *Dorsey v. Citizens & Southern Financial Corporation*, 678 F.2d 137

(11th Cir. 1982)(*vacated and remanded on other grounds*)("Federal Reserve Board regulations defining 'adverse action' were binding interpretations of provision of the Equal Credit Opportunity Act requiring creditors to provide statements of reasons to applicants 'against whom adverse action is taken.'"); *See also Virginia Housing*, 117 F.Supp. 2d at 507 ("the Board's Regulation B, which exempts from the definition of 'adverse action' under ECOA a creditor's denial of a credit application that is coupled with a counteroffer that the applicant accepts, is a reasonable and valid exercise of the Board's authority.")  Although the statute does not provide an exception for accepted counteroffers from its definition of adverse action, 15 U.S.C. § 1691(d)(6), the statute is clear in delegating to the Federal Reserve Board the authority to promulgate regulations meant to implement the statute, and these regulations are explicit that accepted counteroffers shall not be considered "adverse actions". Accordingly, an accepted counteroffer does not constitute an adverse action triggering the requirement for a statement of reasons pursuant to 15 U.S.C. § 1691(d)(6) of the ECOA.  Because the counteroffer extending credit to Diaz was accepted, Paragon's decision not to submit Diaz's credit application to the prime

lenders did not constitute an adverse action requiring a statement of reasons pursuant to 15 U.S.C. § 1691(a)(2).[28]

Paragon argues that because its submission of the application to secondary lenders was a counteroffer and not an adverse action it had no obligation to notify Diaz. In support, Paragon cites 12 CFR 202.9(a)(1)(iv) which provides that notification must be made within 90 days of a counteroffer "if the applicant does not expressly accept or use the credit offered." Paragon argues that since this notification provision is limited to counteroffers which are not expressly accepted or used it does not apply to counteroffers, like the one in this case, which have been specifically accepted.

If 12 CFR 202.9(a)(1)(iv) were the only notification provision Paragon would be correct. However, Paragon's argument

---

[28] Moreover, plaintiff's reliance on *Bayard,* 292 F.Supp.2d at 1185 and *Treadway,* 362 F.3d at 978 in support of his contention that the submission to a secondary lender was an adverse action is unavailing.

In *Bayard,* the court found defendant's credit decision was an adverse action because the plaintiff rejected the counteroffer. As discussed above, the regulations exempt from the definition of an adverse action a counteroffer that is made and accepted. The offer in Bayard did not fall under the regulations because it was not accepted. Because the counteroffer in this case was accepted it does fall under the regulations and accordingly, by definition is not an adverse action.

In *Treadway*, the court found that a car dealership's failure to notify plaintiff that it did not send her financing application to any lender was an adverse action and not a counteroffer. In essence, by failing to send the application to any lenders, the dealer failed to make any counteroffer. In the present case it is undisputed that Paragon sent the financing application to secondary lenders, thus presenting Diaz with a counteroffer which he accepted.

Plaintiff has not pointed to any authority and research did not located any cases where an accepted counteroffer was considered an adverse action.

ignores 12 CFR 202.9(a)(1)(i) which provides that a creditor must notify an applicant of an action taken within "30 days after receiving a completed application concerning the creditors . . . counteroffer to . . .the application." Thus, the fact that Diaz accepted the counteroffer merely removes Paragon from 202.9(a)(1)(iv) and brings its notification obligations under 202.9(a)(1)(i), thus obligating Paragon to give notice within 30 days. *See Ricciardi v. Ameriquest Mortgage* Co., 2006 WL 120234, *3 (3d Cir., January 17, 2006)(affirming district court's grant of summary judgment in favor of defendant where plaintiff signed an acknowledgment form that constituted "clear notice that the final loan terms were different than those originally requested"); *Davis v. U.S. Bancorp*, 383 F.3d 761, 767 (8th Cir. 2004)(holding that counteroffer made one week after completed application was within the thirty-day limit); *Armstrong*, 288 B.R. at 422 (failure to give notice of counteroffer constituted violation of ECOA); *Newton*, 24 F.Supp. at 461-462 ("the lender must notify the borrower of the making of a counteroffer, not just the ultimate approval or denial of that counteroffer").

Plaintiff argues that such notice must be in writing. Although ECOA explicitly provides that an adverse action notification requires a written statement of reasons why the

applicant's offer was refused, or written notification of the
applicant's right to such a statement, 15 U.S.C. § 1691(d)(2), 12
C.F.R. § 202(a)(9)(2),[29] the statute is silent as to the form of
notification when the action taken is a counteroffer.[30]
Under the doctrine of *expressio unius est exclusio alterius*,
"when a statute limits a thing to be done in a particular mode,
it includes the negative of any other mode." *Virginia Housing*,
117 F.Supp. 2d at 504 (citing *National R.R. Passenger Corp v.
National Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974);
*Bates v. United States*, 522 U.S. 23 (1997)("[W]here Congress
includes particular language in one section of a statute but
omits it in another section of the same Act, it is generally
presumed that Congress acts intentionally and purposely in the
disparate inclusion or exclusion."). Requiring written
notification of an accepted counteroffer as the plaintiff
suggests would be contrary to this well-established rule of

---

[29] The regulations further provide that when an adverse action is taken
notification shall be in writing and contain a statement of action taken, the
creditor's name and address, ECOA's provisions, the name and address of the
federal agency that administers compliance with respect to the creditor, and
either statement of specific reasons for the action taken, or disclosure of
applicant's right to statement of specific reasons). 12 C.F.R. § 202.9(a)(2).

[30] "Notice of an approval can be implicit, by granting the credit requested .
. . There is no provision, however, for implicit notice of either an adverse
action or a counteroffer." *Newton*, 24 F.Supp.2d at 460(*citing* Official Staff
Commentary, 12 C.F.R. § 202.9(a)(1)-(2)).

statutory interpretation and read into the regulation that which was clearly not contemplated by the Federal Reserve Board.[31]

It is undisputed that the price at which Diaz offered to purchase the vehicle, based as it was on a cash purchase, was rejected once Paragon reviewed Diaz's completed credit application. Having submitted Diaz's application to a sub-prime lender, Paragon increased the required down payment, and set forth new credit terms, which Diaz was aware of before he signed the Bill of Sale and Retail Installment Contract. (Joint Exhibits, Ex. A, Diaz Dep. at 26-28, 37). Because the counteroffer was accepted by Diaz, and did not constitute an adverse action, no written notification was required pursuant to the statute or regulation. Furthermore, because Paragon, by way of the Retail Installment Contract and Bill of Sale, provided clear notice that the terms offered by Paragon differed from those that Diaz offered, and because Diaz was notified of this difference within the 30 days required by 12 C.F.R. 202.9(a)(1)(i), the plaintiff's ECOA claim fails as a matter of law. Accordingly, Diaz's motion for summary judgment on his ECOA

---

[31] Plaintiff points to Appendix C of Regulation B which provides a sample form for a counteroffer which allows a creditor to provide reasons for the refusal to grant credit on the terms requested, and states the new credit terms being offered, but the form is not required by the regulation. 12 C.F.R. § Pt. 202, App. C, Form C-4.

claim is denied, and Paragon's cross-motion on plaintiff's ECOA claim is granted.

<u>NY V&T § 417-a</u>

Diaz moves for summary judgment on his claim that Paragon violated New York Vehicle and Traffic Law § 417-a, which requires that the dealer notify a customer of a vehicle's use as a taxicab, rental vehicle, police vehicle or repurchased vehicle. Specifically, the statute provides that

> Upon sale or transfer of title by a dealer of any second-hand passenger motor vehicle, the dealer shall execute and deliver to the buyer an instrument in writing in a form prescribed by the commissioner which shall set forth the nature of the principal prior use of such vehicle when the dealer knows or has reason to know that such use was as a taxicab, rental vehicle, police vehicle . . .

NY V&T § 417-a(1)(a).

The Regulations of the Commissioner provide that

> This statement shall be conspicuously printed, typed or stamped on the dealer's contract of sale, and the appropriate line checked, and given to the purchaser before the purchaser signs it.

15 NYCRR § 78.13(g)(1).[32]

---

[32] The DMV regulations provide that the "[f]ailure to check a line shall mean that the dealer does not know or has no reason to believe that the principal prior use of the vehicle was as a police vehicle, taxicab, rental vehicle or driver education vehicle. If a dealer uses an oral contract for the purchase of a secondhand passenger motor vehicle, he shall deliver to the purchaser a written statement concerning the prior use of the motor vehicle before accepting payment of a deposit from the purchaser." 15 NYCRR 78.13(g)(1).

The plaintiff argues that because "Diaz's purchase of the car was spread out over several days and is memorialized in at least three documents which can arguably be considered the 'contract of sale,'" he should be granted summary judgment because the required notice was provided only in the last of the three documents, after Diaz had already committed to purchasing the vehicle. Paragon argues that because the final bill of sale included the required notice, summary judgment should be granted in its favor.

The relevant question is thus which of the documents presented by Paragon to Diaz should be considered the "contract of sale" and accordingly, at what point Paragon was obligated to notify Diaz of the vehicle's prior use. The rules of statutory construction require that when the language of a statute or regulation is clear, the Court must give effect to the plain and ordinary meaning of the words used therein. *Green v. State of New York Dept. of Correctional Services,* 2006 WL 531128, *2 (N.Y.Sup.Ct. 2006)(citing N.Y. Statutes, § 94; *People v. Munoz,* 615 N.Y.S.2d 730 (N.Y. App.Div. 2nd Dept. 1994) ). However, when aid to construction of the meaning of words or phrases as used in a statute or regulation is available, there is no rule of law which forbids their use, no matter how clear the words may appear

on initial examination. *See, Raritan Development Corp. v. Silva,* 91 N.Y.2d 98 (1997). "Moreover, the 'plain meaning rule' will not apply where a reading gives use to absurd or mischievous consequences or thwart a manifest purpose." *People v. Petikas,* WL 3271794, *3-4 (N.Y. Dist.Ct. 2005). "In such cases, contextual approach directs that courts will construe the details of a statute in conformity with its denominating general purpose and will read a text in light of context and will interpret the text so far as the meaning of the words fairly permit as to carry out in particular cases the generally expressed legislative policy." *Id.* (*citing* McKinney's Con. Laws of New York, Book 1, Statutes § 111; *see also, In re William W.,* 188 Misc.2d 630, 729 N.Y.S.2d 259 [2001]).

In the present case, the regulations do not define the term "contract of sale." Nor can the term be said to have one ordinary meaning. Accordingly, a court next looks to the purpose of the regulations and to the context in which the term is used. The regulations are in place to prevent consumers from even committing to the purchase of a used vehicle without the knowledge of its prior use. This is evidenced by the provision concerning the oral sale of vehicles which provides that "if a dealer uses an oral contract for the purchase of a secondhand

motor vehicle, he shall deliver to the purchaser a written statement concerning the prior use of the motor vehicle *before* accepting payment of a deposit from a purchaser." 15 NYCRR §78.13(g)(1)(emphasis added). In fact, there would seemingly be little utility to a rule which required dealers to disclose the origin of a resale vehicle only after the buyer had committed himself, via deposit, or otherwise, to its purchase. In the present case, Diaz committed a total of $6,000 and bound himself to purchase the vehicle under the proscribed credit terms, by signing the RISC, before learning that the car was used as a rental vehicle. Considering the purpose and context of the regulation a document which commits the buyer's money and binds him to purchase a vehicle must be considered a "contract of sale" which accordingly, must contain any mandated disclosure of a vehicle's prior use.

Moreover, even if the disclosure did not necessarily need to be contained in the RISC, the statute explicitly requires that the "dealer shall *execute* and deliver" the written disclosure, and it is undisputed that the bill of sale containing the required disclosure was signed by Diaz, but contained no signature line for a Paragon representative and was not signed by any such representative. Accordingly, Paragon did not meet the

requirements of the traffic law and summary judgment is granted to Diaz.

<u>Paragon's Motion for Summary Judgment against Plaintiff's Used Car Lemon Law and Breach of Express and Implied Warranty Claims Pursuant to the Magnuson-Moss Warranty Act</u>

Paragon moves for summary judgment on plaintiff's allegations that (1) the failure of Paragon, or its agents to repair those defects which have substantially impaired the use of the vehicle, constitute violations of New York's Used Car Lemon Law, NY General Business Law § 198-b,[33] and the Magnuson-Moss Warranty Act (the "MMWA"), 15 U.S.C. § 2310[34] and (2) that he is entitled to revocation of acceptance, pursuant to the MMWA. Paragon argues that (1) before he may bring suit on these claims plaintiff is obligated to first pursue the informal dispute settlement procedure as provided by Paragon in the limited

---

[33] New York's Used Car Lemon Law, NY GBL § 198-b provides that the dealer must supply a written warranty requiring the dealer or his agent to repair or reimburse the consumer for repairing any covered part. A dealer's failure to repair a defective covered part which substantially impairs the value of the vehicle constitutes a violation of the statute, and "the dealer shall accept return of the used motor vehicle from the consumer and refund to the consumer the full purchase price". NY GBL § 198-b(c)(1); *Fortune v. Scott Ford, Inc.*, 572 N.Y.S.2d 382, 384 (N.Y. App.Div. 3d Dept. 1991).

[34] The Magnuson-Moss Warranty Act provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1).

warranty pursuant to NY GBL § 198-b(f); (2) the vehicle's defects
are not covered parts under the Lemon Law or the warranty; and
(4) that the defects did not substantially impair the vehicle, as
required under the Lemon Law.  Diaz does not dispute that he
received a written warranty from Paragon that complied with New
York's Lemon Law, (Plaintiff's Complaint, ¶ 61), but argues that
(1) because he did not sign the Limited Warranty, he did not
agree to submit to Paragon's informal dispute settlement
procedure pursuant to New York's Used Car Lemon Law or the MMWA;
(2) Paragon has not presented any proof that Diaz was ever
provided with the warranty and its dispute resolution clause; and
(3) questions of fact exist with respect to whether the defects
substantially impaired the vehicle which preclude summary
judgment.

    To "encourage warrantors to establish procedures whereby
consumer disputes are fairly and expeditiously settled through
informal dispute settlement mechanisms," 15 U.S.C. § 2310(a)(1),
the Magnuson-Moss Warranty Act ("MMWA") provides that if a
warrantor has established such a procedure, and incorporates a
requirement to resort to it in a written warranty, the MMWA
"permits warrantors to require consumers to resort to its dispute
settlement mechanism before suing it under the Act." *Motor*

*Vehicle Mfrs. Ass'n of U.S., Inc. v. Abrams*, 899 F.2d 1315, 1317

(2d Cir. 1990)(citing 15 U.S.C. § 2310(a)(3)).[35]

Similarly, New York's Used Car Lemon Law provides that if a

dealer has established or participates in an informal dispute

settlement procedure that complies with the Federal Trade

Commission's regulations promulgated to implement the MMWA's

informal dispute settlement mechanism,[36] a consumer must first

---

[35] The Magnuson-Moss Warranty Act provides

> "If-- (A) a warrantor establishes [an informal dispute settlement] procedure,(B) such procedure, and its implementation, meets the requirements of such rules, and (C) he incorporates in a written warranty a requirement that the consumer resort to such procedure before pursuing any legal remedy under this section respecting such warranty, then (i) the consumer may not commence a civil action (other than a class action) under subsection (d) of this section unless he initially resorts to such procedure;"

15 U.S.C. § 2310(a)(3).

[36] The federal regulations referred to in the New York Used Car Lemon Law, were promulgated to implement the Magnuson-Moss Warranty Act's informal dispute settlement procedure. 16 C.F.R. § 703 provides that compliance requires a warrantor to disclose on the face of the warranty

> (1) A statement of the availability of the informal dispute settlement mechanism; (2) The name and address of the Mechanism, or the name and a telephone number of the Mechanism which consumers may use without charge; (3) A statement of any requirement that the consumer resort to the Mechanism before exercising rights or seeking remedies created by Title I of the Act; together with the disclosure that if a consumer chooses to seek redress by pursuing rights and remedies not created by Title I of the Act, resort to the Mechanism would not be required by any provision of the Act; and (4) A statement, if applicable, indicating where further information on the Mechanism can be found in materials accompanying the product, as provided in § 703.2(c) of this section.

16 CFR § 703.2(b). In addition, "[t]he warrantor shall take steps reasonably calculated to make consumers aware of the Mechanism's existence at the time consumers experience warranty disputes." 16 C.F.R. § 703.2(d).

resort to such procedure before pursuing a civil action for a refund or replacement pursuant to its Lemon Law claim. N.Y. General Business Law § 198-b(f)(1). Although the consumer is not bound by the result, the use of the informal dispute settlement procedure is a condition precedent to a civil cause of action under New York's Lemon Laws. *General Motors Corp. v. Abrams*, 897 F.2d 34, 40-41 (2d Cir. 1990); *Ho Jo Contracting Co., Inc. v. Schultz Ford, Inc.,* 539 N.Y.S.2d 49, 50 (N.Y. App.Div. 2d Dept. 1989); *Mountcastle v. Volvoville, USA, Inc. et al.*, 494 N.Y.S.2d 792, 794 (N.Y. Sup. Ct. 1985); *Smith v. Chrysler Motors Corp.*, 1990 WL 65700, *2 (E.D.Pa. 1990)(observing that the "MMWA and the Lemon Law is no different from numerous statutes that mandate compliance with administrative procedures prior to pursuing a remedy in federal court" such as Title VII.)

Plaintiff argues that "Paragon cannot rely on the arbitration provision found in the warranty since it is not signed by Diaz and, as such, cannot form the basis of any 'agreement' to arbitrate." (Pl. Rep. Mem., 20).[37]  However,

---

[37] Note that, contrary to plaintiff's description, the provision in the warranty is not an arbitration provision, but merely notice of the dealer's *non-binding* informal dispute settlement procedure provided for by New York's Used Car Lemon Law and the Magnuson-Moss Warranty Act.  The statute distinguishes the non-binding informal dispute settlement procedure, 198-b(f)(1), from the binding arbitration mechanism of the New York New and Used Car Lemon Laws.  N.Y. GBL §§ 198-a(k); 198-b(f)(3); See *General Motors*, 897 F.2d at 41)(New York's Lemon Law allows a consumer to pursue three separate avenues of relief – informal dispute resolution, New York's Attorney General

plaintiff cites no case law or statutory section, nor did research produce any support for the proposition that a non-binding informal dispute resolution procedure is only a prerequisite to litigation when the plaintiff has signed the agreement. The minimally burdensome prerequisite of dispute resolution is provided free to the plaintiff, is not binding, and is completed in no more than forty days. Accordingly, the formality of a signature is not necessary in order to obligate a consumer to participate. In fact, in some circumstances dispute resolution can be conducted without the consent of the plaintiff so long as it is non-binding. *Knox v. Wheeling-Pittsburgh Steel Corp.,* 899 F.Supp. 1529, 1538-1539 (N.D.W.Va.,1995)(finding that "non-exclusive arbitration without an individual employee's consent" was constitutional where "tension between collective representation and an employee's statutory rights are properly balanced," and where plaintiff would be "able to pursue her civil action if she is unsatisfied with the arbitration.") Accordingly, the fact that plaintiff did not sign the warranty containing the

---

arbitration mechanism and judicial relief.); *Lyeth v. Chrysler Corp. et al.,* 734 F.Supp. 86, 89 (W.D.N.Y. 1990)(the alternate arbitration mechanism provided for in New York's New Car Lemon Law "gives aggrieved consumers the option of submitting the dispute to arbitration").

non-binding dispute provision does not free plaintiff from the obligation to exhaust those remedies before bringing suit.

The plaintiff further argues that even if Diaz had signed the warranty agreement and its "arbitration clause", Paragon, as movant, bears the burden of establishing that its dispute settlement procedure complies with the applicable federal regulations. (Plaintiff's Reply Mem. at 21).[38] There are limited circumstances where a plaintiff may bring suit without exhausting the dispute resolution mechanisms provided for in a warranty, namely, where the dealer's informal dispute settlement procedure clearly does not comply with the statute. *See Verdier v. Porsche Cars North America, Inc.*, 680 N.Y.S.2d 596, 597 (N.Y. App.Div. 2d Dept. 1998). However, in order to avoid the informal dispute resolution the plaintiff, not defendant, must show that the dealer's resolution provision does not comply with the statute. *Id.* (holding that summary judgment could not be granted for the defendant where the *plaintiff* showed that the dispute resolution provision did not comply with the statutory

---

[38] Plaintiff also argues that Paragon did not present any proof that Diaz ever received the warranty and its dispute resolution clause. However, plaintiff does not dispute that Paragon provided him with a warranty. Defendant has submitted a copy of a warranty addressed to Diaz and bearing the date on which Diaz concedes he received a warranty. Diaz does not present any evidence suggesting that the warranty now submitted by Paragon is not the warranty he received. Accordingly, Paragon has presented proof, in the form of the warranty itself, demonstrating that Diaz did receive the warranty with the dispute resolution clause.

requirements because it appeared to be optional rather than
mandatory). In this case, the warranty's informal dispute
resolution settlement procedure mandates that:

> the Dealer participates in an informal
> dispute settlement procedure to arbitrate any
> dispute which may arise under Section 198-b
> of the New York General Business Law (the
> "Act" or the "Used Car Lemon Law") relating
> to the warranty. . . The buyer must resort to
> this settlement procedure or such alternate
> New York State arbitration procedure under
> the Act before pursuing any other rights or
> remedies available under the Act. The buyer
> need not resort to the settlement procedure
> if he/she seeks to pursue rights and remedies
> not created by the Used Car Lemon Law.

Thus, the procedure is clearly a prerequisite to any Lemon
Law claim. Nor has plaintiff pointed to any other way in which
the procedure does not comply with the statutory requirements.
Accordingly, plaintiff's Lemon Law claim is dismissed for failure
to exhaust administrative remedies. However, the dispute
resolution provision is optional as to any MMWA claim, and
accordingly plaintiff need not exhaust these procedures prior to
bringing a claim under the MMWA. Accordingly, the motion for
summary judgment on the MMWA claim must be addressed on the
merits.

*Breach of Express Warranty under the MMWA*

"[T]he MMWA makes a warrantor directly liable to a consumer for breach of a written warranty. . . . [A] buyer may obtain a refund of the purchase price from a manufacturer for breach of an express warranty." *Shuldman v. DaimlerChrysler Corp.*, 768 N.Y.S.2d 214, 216 (N.Y. App.Div. 2d Dept. 2003). The MMWA, however, creates no additional bases for liability, but allows a consumer to recover damages under existing state law, and attorneys fees. *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1012 (D.C. Cir. 1986).

The express warranty provided by Paragon provides that for 90 days or 4,000 miles, whichever comes first, Paragon or its agent "will repair or, at the election of the dealer, reimburse the buyer for the reasonable cost of repairing the failure of a covered part." (Def. Ex. 25.) It is undisputed that Paragon made all repairs to the vehicle during the limited warranty period at no cost to Diaz, regardless of whether the defective part was covered under the Used Car Lemon Law or the Warranty. Accordingly, it is undisputed that Paragon performed its duties under its express warranty. Therefore, Paragon's motion for summary judgment with respect to Plaintiff's claim that Paragon violated its express warranty pursuant to the Magnuson-Moss Warranty Act is granted.

*Breach of Implied Warranty under the MMWA*

"Under the MMWA, a consumer who is damaged by a supplier's failure to comply with an implied warranty may file a claim in federal court." 15 U.S.C. § 2310(d). Pursuant to 15 U.S.C. § 2301(7), the MMWA defines "implied warranty" as "an implied warranty arising under state law· in connection with the sale by a supplier of a consumer product." *Haugland v. Winnebago Industries*, 327 F.Supp.2d 1092, 1096 (D.Ariz.,2004). Thus, "[t]he Magnuson-Moss Act is not responsible for creating any new implied warranties for sales of goods. When referring to an implied warranty, the act means 'an implied warranty arising under State law ... in connection with the sale by a supplier of a consumer product.' [15 U.S.C.] § 2301(7)." *Murungi v. Mercedes Benz Credit Corp.*, 192 F.Supp.2d 71, 79 (W.D.N.Y. 2001)(citations omitted); *See also, Shuldman*, 768 N.Y.S.2d at 216.

Under New York law, the relevant implied warranty of merchantability is governed by the Uniform Commercial Code. *Cannon v. Newmar Corp.*, 287 F.Supp. 222 (W.D.N.Y. 2003). N.Y. U.C.C. § 2-314 (McKinney 2003) provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.Y. U.C.C. § 2-314(1). Merchantable goods are those

that "pass without objection in the trade under the contract description . . . are of fair or average quality within the description; and . . . are fit for the ordinary purpose for which they are used" *Id.*

Under New York law, "at a bare minimum the ordinary purpose for which a used car is to be used should be such as to enable the purchaser to transport herself upon the streets and highways of this state or any other in a reasonably safe manner." *McCormack v. Lynn Imports, Inc.,* 452 N.Y.S.2d 821,824 (N.Y.Dist.Ct. 1982). Rather than guaranteeing performance without malfunction during the term of the warranty, a warranty anticipates that failures will occur and that they will be corrected. *Hughes v. Hertz Corp.,* 670 So.2d 882, 886 (Ala. 1995)(citation omitted)). "Whereas the buyer bears the burden of proving a substantial impairment of value under the [UCC], the dealer bears the burden of negating substantial impairment as an affirmative defense under the Lemon Law." *Williams v. Planet Motor Car, Inc.,* 738 N.Y.S.2d 170, 176 (2001)(citing *Jandreau v. La Vigne*, 566 N.Y.S.2d 683 (N.Y. App.Div. 3d Dept. 1991)).

Paragon argues that there is no issue of material fact with respect to whether the vehicle enabled Diaz "to transport [himself] upon the streets and highways of this state or any

other in a reasonably safe manner." *McCormack,* 452 N.Y.S.2d at 824. As evidence, Paragon submits the vehicle's repair records, that reflect three separate repairs to the anti-lock brake sensors during the limited warranty period, as well Diaz's statements that there were no problems with the brakes from June 2003 until May 2004. (Diaz Dep., 78.)

However, Diaz's deposition testimony states that shortly after he purchased the car the vehicle's brakes were not responding, (Diaz Dep., 66-67) and that defect to the brake sensor caused him to fear for his and his family's safety, (Diaz Dep., 88). Because defective brakes would prevent a consumer from using a vehicle in a reasonably safe manner, *see Natale v. Martin Volkswagen, Inc.,* 402 N.Y.S.2d 156, 159 (N.Y.City Ct. 1978), Diaz's statement that the brakes did not work raises a question of fact that preclude summary judgment.

*Revocation of Acceptance under the MMWA*[39]

Under New York law, a purchaser may revoke his acceptance of goods "whose non-conformity substantially impairs value to him."[40] *Cannon v. Newmar Corp.,* 287 F.Supp.2d 222, 227 (W.D.N.Y.

---

[39] Because revocation is a remedy for breach of implied warranty it is actionable under the MMWA. 15 U.S.C. § 2310(d).

[40] "Revocation of acceptance is possible only where the non-conformity substantially impairs the value of the goods to the buyer. For this purpose the test is not what the seller had reason to know at the time of contracting;

2003)(citing N.Y. U.C.C. § 2-608 (McKinney 2003)).  To do so,
"the purchaser must establish that he accepted the goods (1) with
the reasonable assumption that the non-conformity would be cured
and it was not seasonably cured; or (2) without knowing of the
non-conformity if the acceptance was induced by difficulty of
discovery or by the assurances of the seller." *Id.*  "The
purchaser's revocation of acceptance is not final until he
notifies the seller and such 'revocation must occur within a
reasonable time after the [purchaser] discovers or should have
discovered the ground for it and before any substantial changes
in condition of the goods which is not caused by their own
defects.'"  *Id.*(citing N.Y. U.C.C. § 2-608(2)); *See also Williams
v. Planet Motor Car, Inc.*, 738 N.Y.S.2d 170, 176 (2001)("Under
[UCC § 2-608(1)(a)(b);(2)], there are additional requirements for
revocation of acceptance, including explanation for the buyer's
acceptance and a time limit on revocation.") Diaz acquired the
car on May 13. According to his deposition testimony, in June
2003, only several weeks later, Diaz brought the car back to the
dealership and informed Paragon that he wished to return the car

---

the question is whether the non-conformity is such as will in fact cause a
substantial impairment of value to the buyer though the seller had no advance
knowledge as to the buyer's particular circumstances."  Official Comment, UCC
§ 2-608 (2001).

to it. Accordingly, Paragon cannot show that there is no material disputed fact as to whether Diaz revoked his acceptance of the car, and summary judgment is not appropriate on this claim.

Deceptive Sales Practices Pursuant to NY GBL § 349

Paragon moves for summary judgment on plaintiff's claim that defendant's violations of the Truth in Lending Act, Equal Credit Opportunity Act and New York Vehicle & Traffic § 417-a constituted deceptive or unfair practices under NY General Business Law § 349. Pursuant to the statute, a plaintiff must prove that (1) the challenged act or practice was consumer-oriented; (2) the act was misleading in a material way; and (3) the plaintiff suffered injury as a result of the deceptive act. *Oswego*, 85 N.Y.2d at 25.

"Consumer-oriented conduct does not require a repetition or pattern of deceptive behavior . . . but instead must demonstrate that the acts or practices have a broader impact on consumers at large." *Oswego*, 85 N.Y.2d at 25. Private contract disputes, unique to the parties, or "single shot transactions" would not fall within the ambit of the statute. *Id*. at 26(*citing Genesco Entertainment v. Koch et al.*, 593 F.Supp.743, 752 (S.D.N.Y. 1984)). Recognizing "the potential for a tidal wave of litigation against businesses," the court in *Oswego* announced an

objective definition of deceptive practices as representations or omissions "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id*. at 26. "A deceptive practice, however, need not reach the level of common-law fraud to be actionable under section 349." *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (N.Y. 2000); *see also Vaughn v. Consumer Home Mortgage, Inc.*, 2003 WL 21241669, *3 (E.D.N.Y. 2003)("In essence, this claim is like one of fraud, but without the need for intent or reasonable reliance. . . but, unlike [a claim] for fraud, requires that the deceptive practice have an impact on the public at large.") Furthermore, "a plaintiff seeking compensatory damages must show that the "deceptive act or practice . . . caused actual, although not necessarily pecuniary, harm." *Oswego*, 85 N.Y.2d at 26.

*Deceptive Sales Practice Under ECOA*

Where a creditor's action does not violate ECOA it is not misleading in a material way for purposes of a deceptive sales practices claim. McKinney's General Business Law § 349 (d) ("In any such action it shall be a complete defense that the act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any official

department, division, commission or agency of the United States
as such rules, regulations or statutes are interpreted by the
federal trade commission or such department, division, commission
or agency or the federal courts."); *Kramer v. Marine Midland
Bank*, 559 F. Supp. 273, 294 (S.D.N.Y. 1983)("Having found for
defendant on each of the federal claims predicated on such acts .
. . no recovery may be had under the GBL"); *Goldberg v. Manhattan
Ford Lincoln-Mercury, Inc.,* 129 Misc. 2d 123, 125 (N.Y.Sup.Ct.
1985).

Thus, because Paragon's summary judgment motion on Diaz's
ECOA claim is granted, Paragon's motion for summary judgment with
respect to plaintiff's General Business Law § 349 claim must also
granted, and plaintiff's claim that Paragon violated NY GBL § 349
is dismissed.

*Deceptive Sales Practice Under TILA and NY V&T § 417-a*

Paragon also moves for summary judgment as to Diaz's
deceptive sales practices claims under TILA and NY V&T § 417-a.
In order to prove a claim for deceptive sales practices the
plaintiff must show (1) the challenged act or practice was
consumer-oriented; (2) the act was misleading in a material way;
and (3) the plaintiff suffered injury as a result of the

deceptive act. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995).

As discussed above, where a dealer has not violated the underlying federal claim, the dealer has not committed a deceptive sales practice because such practice is not materially misleading. Thus, where as here, the dealer has violated the underlying federal laws of TILA and NY V&T § 417-a, a reasonable jury could find that the dealer engaged in a materially misleading act.

Paragon argues however, that Diaz has failed to allege that the challenged practice was consumer oriented or that he suffered injury as a result of the deceptive act. However, where as here, the record demonstrates that the transactions involved standard documents routinely presented to similar customers, the plaintiff has made a threshold showing that the practice was consumer oriented. *Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 147 -148 (N.Y. App.Div. 2d Dept. 1995)("plaintiffs made the threshold showing of a consumer-oriented practice that "potentially affect[ed] similarly situated consumers" where "[t]he record indicate[d] that defendant Bank dealt with plaintiffs' representative as any customer entering the bank to open a savings account, furnishing the [plaintiffs' representative] with

standard documents presented to customers upon the opening of accounts")(citations omitted). Moreover, plaintiff claims that he paid at least $3,000 more for the vehicle than he would have had it not been for the defendant's deceptive sales practices,[41] thus having made a threshold showing that he was inured by reason of defendant's deceptive sales practice. Accordingly, Paragon's motion for summary judgment on the deceptive sales practices claim with respect to TILA and §417-a claims is denied.

## Americredit's Liability Pursuant to 16 C.F.R. § 433.2

Defendant Americredit moves for summary judgment on plaintiff's claims pursuant to 16 C.F.R. § 433.2, the so-called Holder Rule, that requires all consumer installment contracts to contain the following provision:

> NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT
> CONTRACT IS SUBJECT TO ALL CLAIMS AND
> DEFENSES WHICH THE DEBTOR COULD ASSERT
> AGAINST THE SELLER OF GOODS OR SERVICES
> OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS
> HEREOF. RECOVERY HEREUNDER BY THE DEBTOR
> SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR
> HEREUNDER.

16 C.F.R. § 433.2. The Rule was promulgated in order to cure business practices that "separated the buyer's duty to pay for

---

[41] Furthermore, plaintiff provides evidence that cars previously used as rental cars suffer a 25% decrease in value compared to similar vehicles without such a history. (Pl. Rep. Mem. at 18, n.7.)

goods or services from the seller's reciprocal duty to perform as
promised . . . [and where] [c]reditors dunned consumers and
collected debts despite the consumers' claims and defenses
against the sellers." Federal Trade Commission ("FTC"), 57 Fed.
Reg. 28814, 128815.

Under the Holder Rule any claim which could be asserted
against Paragon may be asserted against Americredit. Because, as
explained above, Diaz's ECOA, Magnuson-Moss Express Warranty, New
York Lemon Law, and Deceptive Sales Practice with respect to ECOA
claims fail, his claims against Americredit pursuant to these
statutes must fail as well. Similarly, because Paragon's motion
for summary judgment with respect to plaintiff's NY V&T § 417-a,
MMWA (Breach of Implied Warranty and Revocation of Acceptance)
and New York Deceptive Sales Practice claims with respect to TILA
and § 417-a is denied, Americredit's motion for summary judgment
with respect to those claims is also denied.

*TILA Claims*

Under the Truth in Lending Act, a creditor

    refers only to a person who both (1) regularly extends,
    whether in connection with loans, sales of property or
    services, or otherwise, consumer credit which is
    payable by agreement in more than four installments or
    for which the payment of a finance charge is or may be
    required, and (2) is the person to whom the debt
    arising from the consumer credit transaction is

initially payable on the face of the evidence of
indebtedness or, if there is no such evidence of
indebtedness, by agreement.

15 U.S.C.A. § 1602(f).

TILA's limited assignee liability is at odds with the more
broadly reaching liability under the Holder Rule. Giving full
effect to the language of the Holder Rule would negate the
protections that TILA provides for the assignee since the FTC
requires that the Holder Rule provision be inserted in all
consumer credit contracts. Every Circuit to address the issue has
found that the specific provisions of TILA override the more
general provisions of the Holder Rule, reasoning that allowing
TILA to override the Holder Rule does not totally negate the
applicability of the Holder Rule, which would still apply in some
situations, and that the Holder Rule, "even though contained
within the contract, was not the subject of bargaining between
the parties, and indeed could not have been. It is part of the
contract by force of law, and it must be read in light of other
laws that modify its reach." *Taylor v. Quality Hyundai Inc.*, 150
F.3d 689, 692-94 (7th Cir. 1998); *Ramadan v. Chase Manhattan
Corp.,* 229 F.3d 194 (3d Cir. 2000); *Green v. Levis Motors, Inc.,*
179 F.3d 286, 296 (5th Cir. 1999); *Ellis v. General Motors
Acceptance Corp.*, 160 F.3d 703, 708-09 (11th Cir. 1998). Because

I am persuaded by the uniform opinions of those Circuits to address this issue, Americredit's motion for summary judgment as to its liability for violations allegedly committed by Paragon is granted.

## CONCLUSION

For the foregoing reasons, plaintiff's Rule 56(b) motions for summary judgment on liability with respect to his TILA and NY V&T § 417-a claims are granted. Plaintiff's motion for summary judgment as to his ECOA claim is denied. Paragon's motions for summary judgment are granted with respect to plaintiff's claims for violations of ECOA, Used Car Lemon Law, Breach of Express Warranty pursuant to the MMWA, and the New York Deceptive Sales Practice statute to the extent that claim is based on violations of ECOA. Paragon's motions for summary judgment are denied as to plaintiff's claims for violations of Breach of Implied Warranty and Revocation of Acceptance pursuant to the MMWA, and the New York Deceptive Sales Practice statute to the extent that claim is based on violations of TILA and NY V&T § 417-a. Americredit's motions for summary judgment are granted with respect to plaintiff's claims for violations of TILA, ECOA, Used Car Lemon Law, Breach of Express Warranty pursuant to MMWA, and the New York Deceptive Sales Practice statute to the extent premised on

violations of ECOA.  Americredit's motions for summary judgement
are denied with respect to plaintiff's claims for violations of
NY V&T § 417-a, Breach of Implied Warranty and Revocation of
Acceptance pursuant to MMWA and the New York Deceptive Sales
Practice statute to the extent these violations are premised on
violations of TILA and § 417-a.

The Clerk is directed to furnish a filed copy of the within
to all parties and to the magistrate judge.

SO ORDERED.


Dated :  March 29, 2006

         Brooklyn, New York




         By: /s/ Charles P. Sifton (electronically signed)

              United States District Judge